[S. F. No. 2064.   Department One.—September 18, 1902.]

## J. P. JARMAN, Respondent, v. JAMES W. REA, Appellant.

SLANDER — ACTIONABLE WORDS — CHARGE OF ACCEPTANCE OF BRIBE IN OFFICE—COLLOQUIUM—PLEADING—SPECIAL DAMAGE.—Where words spoken are actionable *per se,* or are shown to be such by matter of inducement or *colloquium* and proper averments, malice and injury are presumed, and there need be no averment of special damage. Where extrinsic facts are alleged showing that the defendant intentionally and falsely charged the plaintiff, while a candidate for a second term, in the presence and hearing of others, who understood his meaning, with having accepted a bribe while in office as councilman, it shows a libelous charge, and special damage need not be alleged.

ID.—IMPUTATION OF CRIME, HOW PLEADED.—It is not required that in a complaint for a false and slanderous imputation of crime to the plaintiff the facts should be set forth with all the technicality or precision of an indictment; but it is sufficient if the crime be imputed in the ordinary language usually employed to denote it in lay conversation.

ID.—AMENDMENT OF PLEADING—DEMURRER—CHANGE OF RULING—EVIDENCE.—Where the court, after the admission of evidence under the original complaint, a demurrer to which had been sustained as to the first count, and overruled as to the second count, and after allowing an amendment of the complaint to make the first count good, overruled a demurrer thereto, and sustained it as to the second count,— the plaintiff had the right to so much of the evidence previously introduced as was relevant to the first count, or showed malice and a repetition of the slander alleged therein; and the defendant, who did not specify what part of the testimony he considered no longer relevant, with the exception of the testimony of one witness, which was stricken out, cannot sustain an objection that all of the testimony previously introduced fell with the sustaining of the demurrer to the second count.

ID.—EVIDENCE—EXTRINSIC CIRCUMSTANCES—TESTIMONY OF BYSTANDERS —UNDERSTANDING OF WORDS USED.—Where the words used are not actionable *per se,* and extrinsic circumstances are alleged as necessary to make them actionable, these circumstances must be proved, and when proved, and it appears that the bystanders had knowledge of them when the words were uttered, they may properly be permitted to testify as to how, in the light of all the facts, they understood the words.

ID.—SOURCE OF INFORMATION NOT MATERIAL.—It is not material how the witnesses got their information of the extraneous facts; but it is sufficient that the testimony showed clearly that defendant could

not have referred to any other transaction than that alleged, and that the witnesses were fully warranted in construing defendant's language to mean that he charged the plaintiff with the crime of bribery.

ID.—INSTRUCTION—STATEMENT OF PLAINTIFF'S CLAIM—PROVINCE OF JURY.—An instruction merely stating the claim of the plaintiff as to the facts, and not stating such facts as proved, does not usurp the province of the jury by charging it as to matter of fact.

ID.—PRIVILEGED COMMUNICATION — CHARGE AGAINST CANDIDATE FOR OFFICE.—While the truth may be spoken about a candidate for office, such candidate is as much entitled to protection from defamation as any other citizen. Whoever charges him falsely with the commission of a crime in the presence of persons who understood the meaning of his words must make good the injury thereby occasioned. Such charge is not a privileged communication, if proved to be false, but must be presumed malicious and slanderous. The defamer cannot avoid just responsibility for the injury by the claim that he-acted in good faith without malice and believed the slanderous words to be true.

ID.—CHARGE OF BRIBERY IN PURCHASE OF STEAM-ROLLER—DELIVERY AFTER TERM OF OFFICE.—Where the plaintiff was falsely charged with having taken a bribe for advocating and voting for a resolution to authorize the mayor to purchase a steam-roller, the fact that the purchased roller was not in fact delivered to the city until the plaintiff's term of office had expired, is immaterial.

APPEAL from a judgment of the Superior Court of Santa Clara County and from an order denying a new trial. A. S. Kittredge, Judge.

The facts are stated in the opinion of the court.

H. V. Morehouse, F. J. Hambly, D. W. Burchard, and E. M. Rea, for Appellant.

The words not being actionable *per se,* special damages must have been alleged and proved. (*Pollard* v. *Lyon,* 91 U. S. 225; 3 Lawson's Rights and Remedies, secs. 1303, 1305, 1306; Odgers on Slander and Libel, pp. 313, 388; Newell on Defamation, pp. 849, 850, 856, 864; 5 Ency. Pl. and Prac., p. 766; *Cook* v. *Cook,* 100 Mass. 194; *Linney* v. *Maton,* 13 Tex. 454; *Brandt* v. *Towsley,* 13 Wend. 253; *Maynard* v. *Fireman's Fund Ins. Co.,* 34 Cal. 48;[1] *Fry* v. *McCord,* 95 Tenn. 678.) A communication without malice relative to the fitness of a candidate for office by one acting in good faith is privileged.

[1] 91 Am. Dec. 672.

(*Foster* v. *Scripps*, 39 Mich. 376;[1] *Press Co.* v. *Stewart*, 119 Pa. St. 584; *Marks* v. *Baker*, 28 Minn. 162; *State* v. *Balch*, 31 Kan. 465; *Mott* v. *Dawson*, 46 Iowa, 533; *Briggs* v. *Garrett*, 111 Pa. St. 404.[2]) An innuendo cannot enlarge or broaden the meaning of the words used. (*Grand* v. *Dreyfus*, 122 Cal. 58.)

A. H. Jarman, Edwin A. Wilcox, and D. M. Delmas, for Respondent.

The words used are shown to have been intended falsely to charge the commission of a crime, and the bystanders so understood them, and this shows an actionable offense. (*Kedrolivansky* v. *Niebaum*, 70 Cal. 216; *Harris* v. *Zanone*, 93 Cal. 59; *Frolich* v. *McKiernan*, 84 Cal. 177; *Nidever* v. *Hall*, 67 Cal. 79.) The instruction objected to was correct. A candidate for office is as much protected from defamation as any other citizen. (*Post Pub. Co.* v. *Hallam*, 59 Fed. 530, 541; *Smith* v. *Burrus*, 106 Mo. 94;[3] *Burt* v. *Advertiser Newspaper Co.*, 154 Mass. 238; *Belknap* v. *Ball*, 83 Mich. 583; *Upton* v. *Hume*, 24 Or. 420;[4] *Lewis* v. *Few*, 5 Johns. 1, 36; *Aldrich* v. *Press Printing Co.*, 9 Minn. 133;[5] *Commonwealth* v. *Clap*, 4 Mass. 163;[6] *Wheaton* v. *Beecher*, 66 Mich. 307; *Bronson* v. *Bruce*, 59 Mich. 467;[7] *Brewer* v. *Weakley*, 2 Over. 99;[8] *Sweeney* v. *Baker*, 13 W. Va. 183;[9] *Hamilton* v. *Eno*, 81 N. Y. 126; *Rearick* v. *Wilcox*, 81 Ill. 77; *Root* v. *King*, 7 Cow. 613; *King* v. *Root*, 4 Wend. 113;[10] *Seely* v. *Blair*, Wright, 358; *Curtis* v. *Mussey*, 6 Gray, 261.)

THE COURT.—Action for slander. The second amended complaint, as afterwards amended, set forth two alleged causes of action. In the first of these it is alleged that plaintiff was duly elected, in the year 1895, a member of the common council of the city of San José, and continued in said office for a period of two years; that while plaintiff was councilman as aforesaid, —to wit, on February 8, 1897,—O. S. Kelley Company, the owner of a certain steam-roller adapted to public street-work, proposed to sell the same to said city for $3,950; that on said

[1] 33 Am. Rep. 403.
[2] 56 Am. Rep. 274, and note.
[3] 27 Am. St. Rep. 329.
[4] 41 Am. St. Rep. 863.
[5] 86 Am. Dec. 84.
[6] 3 Am. Dec. 212.
[7] 60 Am. Rep. 307.
[8] 5 Am. Dec. 656.
[9] 31 Am. Rep. 757.
[10] 21 Am. Dec. 102.

day said proposal was by said council referred to the street committee, of which plaintiff was then chairman; that on February 24, 1897, said committee, pursuant to said resolution, made report to the council, signed by plaintiff as chairman, recommending the acceptance of said proposal; that the report was, by resolution, duly adopted February 24, 1897, and by the same resolution the mayor of said city was authorized to enter into a contract on behalf of said city with said company for the purchase of said steam-roller upon the terms of said proposal; that said resolution was adopted by the unanimous vote of the council, including plaintiff; that on March 2, 1897, said mayor, pursuant to said last-named resolution, did enter into and execute a written contract with said company, whereby said company sold, and said city bought, said roller in accordance with said resolution; that plaintiff was at no time a member of said O. S. Kelley Company, and had no interest therein nor in said roller, nor in the money to be paid for the sale thereof to said city; that at no time did plaintiff, or any councilman, receive or have the right to receive from any person or persons any part of the price paid, or to be paid, for the purchase of said roller, or to receive, either as councilman or otherwise, as compensation, any money or other thing on account of such purchase; that on March 14, 1898, in the presence of one Koenig and plaintiff and other worthy citizens, at said city, said defendant spoke, published, and uttered the words following: ''There was nine hundred dollars paid on the purchase of that steam-roller to some of the councilmen, and you got four hundred of it''; that "said words are false, malicious, and defamatory, and were spoken of and concerning plaintiff, and said words meant, and said defendant intended them to be understood, and they were understood by said Koenig and said other persons, in whose presence they were spoken, to mean that plaintiff, whilst a member of said common council, had received a bribe of four hundred dollars with intent corruptly to influence him as such member of said council, in his action on a matter pending before said council, —to wit, the purchase of said steam-roller; that by reason,'' etc., plaintiff had been damaged, etc. After some testimony in the case had been taken, the court reconsidered its action in the matter of ruling on defendant's demurrer to the amended complaint, allowed an amendment to the amended com-

plaint, sustained the demurrer as to the second count, and overruled it as to the first cause of action. The amendment to the amended complaint related to the extrinsic facts concerning the purchase of the roller, immediately preceding the words spoken as shown above. The second cause of action need not be set out.

1. Appellant's first point is, that the words uttered were not actionable *per se,* and therefore, "there must be in the complaint an averment of special damages and proof thereof, and there is no averment and no proof." The question was presented by demurrer, and also, at the conclusion of plaintiff's evidence, by motion for a nonsuit.

Plaintiff's position is thus stated: "No matter how made, if the words, construed in the light of the surrounding facts, impute to the plaintiff the commission of a crime, and it is averred and proved that such was the sense in which the hearers understood them, the offense of slander is complete. Injury to the character of the plaintiff is presumed, as matter of law; no special damage need be pleaded or proved." Plaintiff cites *Nidever* v. *Hall,* 67 Cal. 79; *Kedrolivansky* v. *Niebaum,* 70 Cal. 216; *Frolich* v. *McKiernan,* 84 Cal. 177, where the language was spoken of and concerning plaintiff for the purpose of injuring him in his office as secretary of a certain corporation which he then held. The court said: "This was sufficient to make the language actionable, and it was not necessary to allege special damages." (Citing Civil Code, sec. 46, and *Butler* v. *Howes,* 7 Cal. 87.) The remaining case cited by plaintiff is *Harris* v. *Zanone,* 93 Cal. 59. The rules of pleading and evidence in slander cases were quite fully brought out in this case. The technical objections urged at common law to a declaration for slander, it was aptly said, were "often made the means by which justice was herself smothered in her own robes." In that case the words used were, "She is a damned thief," and it was held that the words were libelous in themselves, and are presumed to have been understood by the hearers to be libelous.

It seems to be a well-settled rule both in England and in this country that words imputing a want of integrity in any one holding an office of confidence or trust, whether an office of profit or not, are actionable *per se.* The rule is found in the Civil Code (sec. 46, subd. 3). (Odgers on Libel and Slander,

p. 308.) In such cases the law will presume damage. (Odgers on Libel and Slander, p. 308.) The rule has also been held to be, where one is defamed in his office or occupation, that the plaintiff must always allege in the pleading that he was carrying on the profession or trade, or holding the office, at the time the words were spoken. (Odgers on Libel and Slander, pp. 65, 68, note a, and cases cited.) To same effect is Newell on Slander, p. 175; 3 Lawson's Rights and Remedies, secs. 1248, 1251, 1269; Starkie on Slander, p. 110. Mr. Townshend says: ''No language concerning one in any special character, published after he has ceased to occupy that character, can be actionable as concerning him in such character. One of the. essential elements of the actionable quality of language concerning one in his occupation or office is the fact that the person whom the language concerns is in such occupation or office.'' (Townshend on Slander, sec. 189.) The question was considered in *Forward* v. *Adams,* 7 Wend. 205. A controlling fact in that case was that the offense charged was not indictable.

In *Pollard* v. *Lyon,* 91 U. S. 225, also relied on by appellant, the cases on the point as to the necessity for alleging special damages were fully presented, and it was held that where the words are not actionable in themselves, not charging an indictable offense, there must be a statement of the special loss or injury or the declaration is bad, although the language used imputes moral turpitude.

Mr. Townshend speaks of cases relating to persons holding office or employment as not strictly exceptions to the rule, but as comprehended in a different class. He says: ''On examination they will be found to range themselves under the division relating to language concerning an individual as such; and the true ground on which in such cases the actions were sustained was of the language being actionable as affecting the individual as such, without regard to his having occupied the special character to which the language refers. Thus where one had been a senator, and after his term of office had ceased it was published of him in writing that he had been guilty of corrupt conduct in his office of senator, the action was sustained; and so where one had been a constable, and after he quitted that office it was said of him that while in office he was a healer of felons; or of one that, when in office

as a justice, he was a bribing justice," (citing cases). Assuming for the moment that the words here, together with the extrinsic facts, constituted the charge of committing bribery a felony by our statute, we cannot doubt that the action would lie. It would be a strange condition of the law that would tolerate libel and slander of a citizen who had ceased to hold the office in which he was falsely accused of betraying his trust by accepting bribes. It would be difficult to conceive of a more direct means to affect injuriously "the individual as such, without regard to his having occupied the special character to which the language referred." No good citizen would have the temerity to accept office if with impunity he could, after retiring, be charged with all the crimes in the calendar while in office. Only those who are the most reckless of reputation and abandoned in private character, having nothing to lose, would venture to so expose themselves. There is a wide difference between just, or even unjust, criticism of the manner in which official duty is discharged and a direct charge of an indictable offense in the discharge of official duty.

It remains only to inquire whether the explanatory or extrinsic facts alleged—or what is technically termed inducement or *colloquium*—had the effect to make the words uttered actionable and relieved the plaintiff from alleging and proving special damages. Appellant claims that the circumstances alleged were intended to show that plaintiff had been guilty of bribery in office, but that they fail to so show, and therefore the demurrer should have been sustained. It is not required that the facts should be set forth with all the technicality or precision of an indictment, if the crime be imputed in the ordinary language usually employed to denote it in lay conversation. (Odgers on Libel and Slander, p. 120.)

Where the words are actionable in themselves there is no occasion for inducement to be alleged, but where the words are not actionable they may be made so by the inducement, and it is then no more necessary to allege special damages than where the words are actionable in themselves. So long as they are made actionable by appropriate pleading, it is immaterial whether this comes about through the words themselves or through the words coupled with the inducement.

Words not actionable in themselves may be made so by a *colloquium* and proper averments. (Newell on Slander, pp.

603, 613, citing *Stancell* v. *Pryor,* 25 Ga. 40.) It is the office of
the inducement to narrate the extrinsic circumstances which,
coupled with the language published, affect its construction
and render it actionable, where, standing alone and not thus
explained, the language would appear either not to concern the
plaintiff, or, if concerning him, not to affect him injuriously.
(Townshend on Slander, p. 554, and notes.) In view of the
language used and the circumstances alleged, we think the
hearers might reasonably have understood the words to impute
the crime of bribery to plaintiff, and that defendant so intend-
ed them, as is alleged in the complaint. There is nothing in
*Grand* v. *Dreyfus,* 122 Cal. 58, in conflict with this view. The
demurrer was therefore properly overruled.

2. As the pleadings stood when the parties went to trial,
the court held that the words set forth in the first count did
not constitute slander *per se,* but that the matters set out in the
second count did constitute slander in themselves. It was after
several witnesses had given their testimony and documentary
evidence had been admitted that plaintiff had leave to amend,
and on doing so, by alleging the facts already pointed out,
the court sustained the renewed demurrer to the second count
and overruled it as to the first, and the trial proceeded. De-
fendant's second point is, that "all the testimony which had
been given in behalf of the second count was inadmissible,
and fell by virtue of the court sustaining the demurrer to that
count, and was certainly error." No motion was made to
strike out any part of this evidence, except as to the witness
Tompkins. While the evidence was no longer relevant to the
count to which it had been addressed, it was relevant as show-
ing malice and went to the question of damages, for it showed
a repetition of the slander contained in the first count, and
some of it bore upon the first count as subsequently amended.
Defendant should have specified what part of the testimony
he deemed no longer relevant, and thus have given plaintiff
an opportunity to re-offer it and have a ruling of the court.
Plaintiff had a right to such of the evidence as was relevant
to the first count, for the amendment was made in part to meet
the evidence given and in part to so prepare the pleadings as
to allow some of plaintiff's evidence that had been excluded.

3. It is urged that the court erred in permitting the witnesses
Landers and Koenig, who heard the words, to testify to what

they understood defendant to mean by the language charged
to have been used by him; because, 1. If the words were slan-
derous in themselves, the law prohibits proof of how they were
understood; 2. If not slanderous *per se*, then, without an
averment of special damages or proof of special damages, the
testimony was inadmissible; and 3. Because the only knowl-
edge the witnesses had of the facts they gathered from the
newspapers.

Where the words are slanderous in themselves, standing
alone, the law presumes that they were so understood, and
requires no proof as to how they were understood; and the
same would be true after proof is made of the extrinsic circum-
stances which show that the words used are actionable. Where,
however, the words used are not *per se* slanderous, and extrin-
sic circumstances are alleged as necessary to make them
actionable, these circumstances must be proved, and when
proved, and it appears that bystanders had knowledge of them
when the words were uttered, we see no reason why the
hearers should not testify as to how, in the light of all the
facts, they understood the words. Furthermore, the rule that
makes it inadmissible to show by the bystanders what they
understood the words to mean is one of convenience, which
relieves the plaintiff from making such proof, because the
words carry their own meaning, and are presumed to be under-
stood in their slanderous sense. It would not, however, be
prejudicial error to allow proof of what the law presumes.
(*Preston* v. *Frey*, 91 Cal. 107.) We have already shown that
it was not necessary to allege special damages. The words
used, coupled with the circumstances, were actionable and im-
puted an indictable offense, and, as already shown, it was not
necessary to allege or prove special damages. It is true that
the witnesses obtained some, but not all, their knowledge of the
extraneous facts from the newspapers. They testified to
knowledge that plaintiff was a councilman during the term
when the steam-roller was ordered to be purchased. They
learned from local papers the proceedings of the council as to
the purchase, and they understood that defendant referred
to this roller and these proceedings, and that they understood
defendant to charge that plaintiff had accepted a bribe of
four hundred dollars to influence him as a member of the
council in the matter of purchasing this steam-roller. It is

not material how the witnesses got their information. The extraneous facts alleged were true, and became known in some way to the witnesses, and it was in the light of this knowledge that they put their interpretation on the language used. The testimony showed very clearly that defendant could have referred to no other transaction than the one alleged, and that the witnesses were fully warranted in construing defendant's language to mean that he charged plaintiff with the crime of bribery.

4. It is complained that the court instructed the jury that the witnesses Landers and Koenig "were acquainted with the facts that such negotiations for the purchase of a steam-roller were had by said council, and that the plaintiff was a councilman at the time such negotiations were had." The objection is, that the instruction invaded the province of the jury. If this were all of the instruction, it would appear to violate the rule of law invoked. An examination of the instruction shows, however, that the court did not state what is quoted above as a fact, but that "plaintiff's claim is, in general terms," so and so, including the above excerpt.

5. The transcript shows that in the course of his argument to the jury, Mr. Morehouse, one of defendant's attorneys, referred to an article of March 16, 1898, published in the San José Daily Mercury, purporting to give an interview by the reporter of that paper with defendant, the day following the alleged slander. Mr. Morehouse read from the interview the following: "Is the statement which purports to have been made by Mr. Jarman in reference to a conversation had with you," etc., and drew the inference therefrom to the effect that Mr. Jarman, plaintiff, started the newspaper controversy referred to by Mr. Delmas, plaintiff's attorney, in his argument. Plaintiff's counsel objected, and Mr. Morehouse insisted upon his right "in drawing inference therefrom on the ground that the article of the Mercury is in evidence, and is part of the record in the case." The record is not sufficiently clear as to the nature of the inferences which counsel was deducing to enable a reviewing court to fairly pass upon the point. From the briefs we may assume that the inference being drawn was, that plaintiff had started a newspaper controversy with defendant concerning the alleged libelous words, and that defendant's counsel was commenting on the fact that plaintiff

started the controversy, from which we suppose it was being argued that defendant had a right to answer in the same manner. The article in the Mercury contained the following statement: "In yesterday morning's issue of the San Francisco Call appeared an article written by the San José political correspondent, in which James W. Rea is alleged to have made libelous utterance concerning J. P. Jarman, New Charter Club nominee for office of councilman-at-large. But one side of the story was given. For the purpose of obtaining Mr. Rea's version, a representative of the Mercury called on that gentleman yesterday at his office in the Martin building, where the following conversation took place." The interviewer referred to the Call article, and in answer to him defendant stated that he had read the article, and that it was correct in some particulars, but did not give all that was said by the parties at the time the alleged slanderous words were spoken. Defendant then proceeded to give his version, as shown in the Mercury article and as appears in the record, and was offered by plaintiff to show malice on the part of defendant. The Call interview was not in evidence, and there was no evidence connecting plaintiff with its authorship. The introductory matter in the Mercury interview was the statement of the reporter, and was not evidence that plaintiff made any statement to the Call, or that there was an article in the Call. The inference, therefore, that plaintiff started the newspaper controversy had no evidence on which to rest. The ruling of the court was not error.

6. There was neither pleading nor proof that the charge of bribery was true, and the court so instructed the jury, and also instructed the jury that there is not "either in the pleadings or in the evidence any ground for claiming that if the defendant on said occasion made said charge [referring to the time when the words were spoken], he did so under circumstances which would make his language in law privileged."

The Civil Code (sec. 47) declares that "A privileged publication is one made. . . . 3. In a communication, without malice, to a person interested therein, by one who is also interested therein, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information."

Defendant was a taxpayer in San José, and the persons in whose presence the words were spoken were voters therein, and plaintiff was then a candidate for election to the council. On these grounds pleaded and in evidence it was claimed the publication, made in good faith and without malice, was privileged. The court instructed the jury as follows: "Under the laws of this state a candidate for office is as much entitled to protection from defamation as any other citizen. Whoever charges him falsely with the commission of a crime, in the presence of persons who understand the meaning of his words, must make good the injury thereby occasioned. He may not avoid this just responsibility by the claim that he acted in good faith without malice."

There is nothing in the pleadings or in the evidence which would warrant the defense of privileged communication.

Where a crime is imputed malice is presumed, and this presumption is not rebutted by an allegation or proof that the slanderous words used were believed to be true. Nothing short of alleging and proving their truth would rebut the inference of malice. In the case here the evidence was that the crime was falsely charged, and defendant did not allege or prove the truth of his accusation. If the section of the Civil Code above quoted includes such a case as we have here, defendant did not bring himself within its provision either by his pleading or proof, and hence the court did not err in its instruction. We think the learned trial judge had a true conception of the law in giving the instruction we have quoted, and that it is in harmony with cases in other states. It was held in *Aldrich v. Press Printing Co.*, 9 Minn. 133,[1] that libelous matter published against a candidate for a public office is not a privileged communication. The court said: "We think a public journal or an individual who indulges in defamatory assertions about candidates for office is equally liable for his acts with those who commit the same offense against private individuals." In *Sweeney v. Baker*, 13 W. Va. 158,[2] the question had very elaborate treatment and the cases were quite fully collated. It was held that while a newspaper might publish with impunity criticisms of the mental or physical qualifications of a candidate for office, if the publication be libelous as to his moral qualifications, the party making the publication may be held

---

[1] 86 Am. Dec. 84.　　　　[2] 31 Am. Rep. 757.

liable, unless he can prove the charges to be true. It will not be sufficient in such case to prove, said the court, that the party publishing had good reason to believe, and did believe, them to be true, as a publication of this character is not even conditionally privileged. From the publication of such libelous charges the law implies malice as well as damages to the plaintiff. In *Seeley* v. *Blair*, Wright, 358, the court said: "If one accuse another of crime, he is presumed to make a false accusation; and malice is inferred from the falsehood. That the plaintiff was a candidate for office is no excuse for slandering him. . . . It would subvert our government to allow the promulgation of falsehood, which would drive from office men who regard character and leave it only to those without any." In a suit between the same parties, reported in the same volume (p. 686), the charge was forgery, and the court said: "As to the point urged, that the plaintiff was a candidate for office, and the defendant an elector, I need only say the relation of the parties to each other, or to the public, confers upon the defendant no right to utter falsehood and calumny. An elector may freely canvass the character and pretensions of officers and candidates; but he has no right to calumniate one who is a candidate for office with impunity. If the law sanctioned such a course, it would drive good men from the administration of public affairs and throw our government into the hands of the worthless and profligate."

In the case of *Root* v. *King*, 7 Cow. 613, and *King* v. *Root*, 4 Wend. 113,[1] the publication in a newspaper was, that Lieutenant-Governor Root, while presiding over the senate, was disgustingly drunk, and that he was an habitual drunkard. He was at the time of the publication a candidate for office. Chancellor Walworth said: "It is supposed by the counsel of the defendants that an editor of a public paper may publish what he pleases of candidates for public office with impunity, provided he satisfies the jury he believed it was true, or that he had no ill-will against the person injured. . . . In ordinary cases of slander, the term maliciously means intentionally and wrongfully, without any legal ground or excuse. Malice is an implication of the law from the false and injurious nature of the charge. In this respect it is entirely different from actual malice or ill-will towards the individual, which is frequently

[1] 21 Am. Dec. 102.

given in evidence for the purpose of increasing the damages. In ordinary cases of slander or libel, it is not necessary to allege in the declaration that the words were spoken or the charge published maliciously. It is sufficient to aver that it was falsely and injuriously done." After pointing out some distinctions relating to privileged communications, the learned Chancellor said: "It is, however, insisted that this libel was a privileged communication. If so, the defendants were under no obligation to prove the truth of the charge; and the party libeled had no right to recover unless he established malice in fact or showed that the editors knew the charge to be false. The effect of such a doctrine would be deplorable. Instead of protecting, it would destroy the freedom of the press, if it were understood that an editor could publish what he pleased against candidates for office, without being answerable for the truth of such publications. No honest man could afford to be an editor, and no man who had any character to lose would be a candidate for office under such a construction of the law of libel. The only safe rule to adopt in such cases is to permit editors to publish what they please in relation to the character and qualifications of candidates for office, but holding them responsible for the truth of what they publish." In *Sweeney* v. *Baker,* 13 W. Va. 158,[1] the court said: "The fact that the party is a candidate for an office to be bestowed by the votes of the people, so far from its being a justification for such falsehoods, makes the outrage greater. . . . If it were allowed by law to be done with impunity, it would be utterly destructive of republican government. Who would be a candidate for office in such a government, if falsehoods of this infamous character could be published against him? The supreme court of Missouri, in *Smith* v. *Burrus,* 106 Mo. 94,[2] said: "None would be such candidates but abandoned men who had no respect for their characters. And how intolerable would the government become whose offices were filled by men of such character. The law, as well as the juries, must suppress such licentiousness of the press. . . . There is a conflict of authority on the question whether such an instruction should be given in instances like the present; but as this case is one of first impression in this state, we are free to adopt that rule which we regard as best comporting with the proper

[1] 31 Am. Rep. 757.              [2] 27 Am. St. Rep. 329.

preservation of the rights of individuals, good government, social order, justice, and sound reason. The correct rule, we take it, is that expressed by the supreme court of Massachusetts, in *Commonwealth* v. *Clap,* 4 Mass. 163,[1] where Chief Justice Parsons, speaking for the court, said: 'When any man shall consent to be a candidate for a public office conferred by the election of the people, he must be considered as putting his character in issue, so far as it may respect his fitness and qualifications for the office; and publications of the truth on this subject, with the honest intention of informing the people, are not a libel; for it would be unreasonable to conclude that the publication of truths, which it is the interest of the people to know, should be an offense against the law. For the same reason the publication of falsehood and calumny against public officers or candidates for public offices is an offense most dangerous to the people, and deserves punishment, because the people may be deceived, and reject the best citizens, to their great injury, and it may be to the loss of their liberties.' " (See, also, to the same effect, *Wheaton* v. *Beecher,* 66 Mich. 307; *Bronson* v. *Bruce,* 59 Mich. 467;[2] *Brewer* v. *Weakley,* 2 Over. 99;[3] *Hamilton* v. *Eno,* 81 N. Y. 116.) In *Rearick* v. *Wilcox,* 81 Ill. 77, the court said: "The character and reputation of appellant was as sacred, and as much entitled to protection, when a candidate for office as at any other time." (See, also, *Post Pub. Co.* v. *Hallam,* 59 Fed. 530, opinion by Mr. Justice Taft, and cases there cited, English and American.)

We do not think the defendant, either by his pleading or by the evidence, brought himself within the privilege given by the law. The charge was proven to be false; it was not alleged by defendant to be true; it was by presumption of law and shown by the evidence to be malicious. We find no error in the instruction.

7. The remaining point made by defendant is, that because the steam-roller was not actually delivered under the conditional contract made by the mayor until a few days after the term of office of plaintiff had expired, it was not possible for bystanders to have understood the words to mean that plain-

---

[1] 3 Am. Dec. 212.          [3] 5 Am. Dec. 656.

[2] 60 Am. Rep. 307.

tiff had received a bribe to influence his vote for such purchase. There is no merit in this point. The charge made and understood and intended to be made was the acceptance of a bribe by plaintiff in his action as councilman. If he had taken a bribe for advocating and voting to authorize the mayor to make the purchase, his crime would have been complete. It is immaterial that the purchase was not finally consummated by the mayor, in pursuance of the action of the council, until after plaintiff ceased to be a member.

The judgment and order are affirmed.