[Civ. No. 27640. Second Dist., Div. Three. May 6, 1965.]

E. L. WHITE, Plaintiff and Respondent, v. FRANK
VALENTA, Defendant and Appellant.

244

Mark F. Joseff, Arnold P. Mordkin and Clark Fergus for Defendant and Appellant.

Eldon J. Koorstad for Plaintiff and Respondent.

KAUS, J.—This matter comes before us on a settled statement. A jury found appellant liable in a slander action brought by respondent and assessed compensatory damages at $5,000 and punitive damages at $2,500. The facts are unusual:

Respondent was the president and sole stockholder of two corporations selling new cars and used cars respectively. The corporations did business on two lots which were separated by premises owned by appellant who conducted his business there. For two years before the incident which became the subject matter of this lawsuit, respondent's corporations had been advertising their cars through the medium of television, the commercials being personally narrated and delivered "live" by respondent from the new car lot. As a result of such advertising, respondent individually and his two corporations, became widely known in the Los Angeles metropolitan area and obtained a general reputation as responsible automobile dealers.

On October 14, 1962, appellant saw an unidentified automobile parked on his premises. He assumed that the car belonged to one of respondent's corporations or to a customer of the corporations and tried to reach respondent on the telephone. He was told that respondent was delivering a television commercial. Nevertheless he demanded that respondent personally and immediately remove the car. Respondent's sales manager then talked to appellant and told him that a porter would remove the car.[1] During this conversation appellant was angry and abusive. There had been some bad blood between the parties in the past and appellant did not feel kindly toward his neighbors, their employees or respondent personally.

At the end of this telephone conversation appellant left his office and saw respondent on the car lot with other persons in his presence. Because the car had not yet been removed he became angry and proceeded directly toward respondent, intending to talk to him about the removal of the car. Two employees of one of respondent's corporations tried to restrain appellant, telling him that respondent was on the air, broadcasting a television commercial, as indeed he was. Apparently there was a minor scuffle during which appellant's shirt sleeve was torn off. Undeterred, he proceeded toward respondent, entering the range of the television camera and the microphone from the right, as seen by respondent's viewing audience. He pointed and waved his hand and finger at respondent in a menacing gesture, saying something which was not too clearly heard by anybody. (A member of the television audience, however, understood the words: "You son-of-a-bitch" and also heard that something was said about a car. She identified appellant as the speaker and understood the words to refer to respondent. She thought that appellant was a customer who had some grievance in connection with the purchase of an automobile from respondent and came to the conclusion that if one bought a car from respondent, one might expect unfavorable treatment. She herself however was not in the market for an automobile at the time.

The settled statement under the heading "The Facts Established In The Trial" states further, without identifying the additional witness who testified thereto: "[Appellant] pointed and waved his hand and finger at [respondent] in a menacing gesture, stating to [respondent]: 'You son-of-a-bitch' and the

---

[1]It was later discovered that the automobile in question did indeed belong to a customer of respondent.

word 'car' was used by [appellant]." It is apparent that it was not the intention of the trial court, in settling the record, to imply that the use of the epithet coupled with mention of a car was either conceded by the parties or established without contradiction. Viewing the matter set forth in its entire context, we have come to the conclusion that the most reasonable interpretation of the settled statement is that it was respondent himself who also testified that these particular words were used.

The only other persons who heard what appellant said were: 1. Three employees of one of respondent's corporations, who were present at the scene and who heard him say "you son of a bitch," but who did not testify as to any particular meaning they attached to the words. 2. Two employees of the television station who, while monitoring the program, saw appellant enter the picture, approach respondent, make the threatening gesture with his hand and also saw respondent back up. One of these employees recalled that appellant used profanity of some sort, believed that the words "you son of a bitch" were spoken, recalled that whatever was said made the broadcast offensive to studio policy and standards and that he cut it off. The other employee did not hear the words "you son of a bitch."

The only injury complained of by respondent was personal shame, embarrassment and humiliation. He worried that the incident might hurt the corporations' business, but the emotional distress was not such as to require medical attention. His fears, however, were unjustified and special damages were neither pleaded nor proved.

The facts related so far appear to be those developed by respondent as his part of the case.[2] There was conflicting evidence as to whether appellant physically touched respondent, but it was conceded that no physical injury was suffered, respondent being merely startled and apprehensive, because appellant seemed to him to be like a "charging bull." Appellant denied speaking the offending words and claimed that they were used by respondent in ordering him off his property. He admitted his anger, that he shook his hand at respondent and that he demanded the removal of the automobile. He claimed not to have known that respondent was on the air, having paid no attention to the television equipment. The torn

---

[2]We cannot be certain, because of the nature of the record, whether the evidence favorable to appellant set forth below was developed by appellant or by respondent as part of his case in chief.

shirt sleeve was explained as having been caused by employees of respondent after, not before, the interrupted commercial.

Appellant urges a reversal of the judgment on three grounds.

1. Respondent was precluded from recovering general and punitive damages because no demand for correction was made as provided in Civil Code, section 48a;

2. The words "you son of a bitch" require pleading and proof of special damages, since they do not, on their face, constitute slander within the meaning of Civil Code, section 46; and

3. The trial court erroneously permitted the jury to determine whether or not the offending words constituted slander per se.

Before discussing appellant's points certain matters should be noted:

1. Originally the action was brought against appellant Frank Valenta and two corporations. Five causes of action were stated. The settled statement recites, however, that the matter proceeded solely against appellant Valenta and only on the first two causes of action which were "consolidated so as to present one cause of action." The first cause of action sounded in slander, the second sought damages for "emotional disturbance." It is our understanding of the meaning of this stipulation that the second cause of action was dropped as such and that any attempt to prove liability based upon the theory of *State Rubbish Collectors Assn.* v. *Siliznoff*, 38 Cal.2d 330 [240 P.2d 282] was abandoned. This assumption is supported by the fact that no instructions on any theory of liability other than slander were given.

2. Although it is apparent from the facts recited that the words spoken by appellant were heard by a few people other than the television audience, it is obvious from the size of the verdict that the publication through the medium of television must have played a vital part in the assessment of damages. Therefore, if it was error to permit proof of the publication through television because respondent did not demand a correction, the judgment cannot be saved, as respondent suggests, because a few of his employees heard the slander.

Turning now to appellant's first point, it must be conceded that literally he comes within the protection of Civil Code, section 48a. The slander was by radio broadcast which is defined as including "both visual and sound radio broadcast." (Civ. Code, § 48.5, subd. (4)). In speaking of libel

by newspaper, the Supreme Court held in *Pridonoff* v. *Balok-ovich*, 36 Cal.2d 788, 791 [228 P.2d 6] that the statute protects not only the publisher of a newspaper but also the newspaper's reporters, columnists, authors, critics and editors. Translating *Pridonoff* into the television field, it is not far-fetched to suggest that persons speaking through that medium may be in the same position, legally, as newspaper writers.

Yet it is our opinion, based on reason and what authority there is, that it would be a perversion of the legislative intent and an arguably unconstitutional application of the correction statute to allow appellant its benefit.

Civil Code, section 48a has been the subject of judicial interpretation both as to the persons and the publications to which it applies. Thus in *Pridonoff* v. *Balokovich, supra,* the authors of a libelous article or news item were held to be protected. In *Farr* v. *Bramblett*, 132 Cal.App.2d 36 [281 P.2d 372], it was held that defendants who, preparatory to the actual printing of paid advertisements in a newspaper, displayed the advertising copy to editors, publishers, managers and employees of the paper, were also protected because the eventual printing of the advertisement in the paper required the earlier display; otherwise the intended effect of section 48a would be lost, since practically every publication in a newspaper involves a prior display of the matter eventually printed by somebody to somebody else. On the other hand in *Mercado* v. *Hoefler*, 190 Cal.App.2d 12 [11 Cal.Rptr. 787], a defendant who uttered a slander to a newspaper reporter who later published it in the newspaper and gave it wide circulation, derived no solace from the correction statute. The court reasoned that the tort was completed when the slander was uttered and that the republication in the paper was relevant only as bearing on the extent of the liability. *Farr* v. *Bramblett, supra,* was distinguished as a case which involved a process relating to newspaper publication and news dissemination, which section 48a was primarily designed to protect. "If appellants' argument were to prevail, persons guilty of oral defamation would enjoy the same protection any time such remarks subsequently found their way into a newspaper. We do not believe that the legislators ever intended such a result in the adoption of said section." (*Ibid.* pp. 18-19.)

This case is not a proper vehicle for drawing sweeping parallels between persons whom section 48a protects in the newspaper business and those covered by it in the television field. Suffice it to say that appellant, had he chosen to dis-

seminate his views of respondent through a newspaper, rather than over the air, would be in the position of one who secretly, without the knowledge or consent of the publisher, somehow manages to insert a libelous statement in the printed and published pages of a newspaper. To afford him the protection of section 48a would be like clothing a burglar with the privileges and immunities appurtenant to the lawful possession of land. Surely, if section 48a were construed to apply to a situation such as this, the constitutional questions which were put to rest in *Werner* v. *Southern Calif. etc. Newspapers,* 35 Cal.2d 121 [216 P.2d 825, 13 A.L.R.2d 252] would arise again. The rule of statutory interpretation which compels courts to adopt that construction of a statute which will save it from constitutional infirmity (*Bodinson Mfg. Co.* v. *California Emp. Com.,* 17 Cal.2d 321, 326-327 [109 P.2d 935]) goes further. "And unless this rule be considered as meaning that our duty is to first decide that a statute is unconstitutional, and then proceed to hold that such ruling was unnecessary because the statute is susceptible of a meaning which causes it not to be repugnant to the Constitution, the rule plainly must mean that where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States* ex rel. *Atty. Gen.* v. *Delaware & Hudson Co.,* 213 U.S. 366, 408 [29 S.Ct. 527, 53 L.Ed. 836].

Concededly the analogy in which we have indulged is only on all fours with the case at bench if respondent's theory that appellant knew he was on television is accepted. We need not discuss or decide what application section 48a would have to appellant's version, namely that he did not know he was on the air. Appellant's reliance on Civil Code section 48a in the court below was total. The record before us shows no request for a ruling at any stage of the trial which would have had the effect of giving appellant the benefit of section 48a in the event he was unaware that he was publishing his remarks through the medium of television. Thus it would have been appropriate for him to present that theory by requesting an instruction to the jury that they must find for the defendant, if they find that he did not know that he was broadcasting. It is also quite apparent that the jury did in fact believe respondent's witnesses. In connection with the instructions on punitive damages, the jury were instructed that they should consider such matters as provocation, mistake or ignorance of

facts or other circumstances that may tend to mitigate or lessen the culpability of defendant's conduct. It is inconceivable to us that they would have awarded $2,500 in punitive damages had they believed appellant.

In holding that appellant is not protected by section 48a, we do not mean to imply that only the owner, licensee or operator of a radio or television station may claim its benefits. Appellant correctly points out that because of Civil Code, section 48.5, which severely restricts the liability of such owners, section 48a would have little significance when applied to broadcasting, if others were not covered. ██ We are perfectly willing to assume that the principle of *Pridonoff* v. *Balokovich, supra,* should be applied in the broadcasting field. We merely hold that an intruder is not protected.

At the outset of our discussion of appellant's second point, namely that because the words spoken do not constitute slander per se, respondent could not recover without pleading and proving special damages, we are met with a rather strange state of the record. ██ The only specific words appellant is supposed to have said according to the complaint are the words "you son of a bitch." Apparently, however, respondent was permitted to prove not only the utterance of those words, but also that they were spoken in connection with the use of the word "car." It is obvious that their use in that connection tends to bring the entire utterance closer to the type of language proscribed by Civil Code, section 46, subdivision 3.[3] We must assume therefore that the range of permissible proof was enlarged by a failure to object. (See *Collison* v. *Thomas,* 55 Cal.2d 490, 498 [11 Cal.Rptr. 555, 360 P.2d 51]; *Vaughn* v. *Jonas,* 31 Cal.2d 586, 605 [191 P.2d 432].) On the other hand the court's key instruction set forth in the footnote[4] disregards the additional language. It seems probable that

---

[3]Civil Code, section 46, subdivision 3 reads as follows: "[Slander: What constitutes.] Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: . . . . 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profits; . . ." It is clear that appellant's language could not be actionable under any of the other subdivisions of section 46.

[4]"In this case, when we refer to the wrong known as slander, we mean a false statement orally uttered which tends directly to injure a person in respect to his office, profession, trade or business by imputing to him general disqualification in those respects which his office, profession, trade or business peculiarly requires by imputing something with reference

both parties and the court did not feel that the additional language incorporating the word ''car,'' which was not clearly understood by any listener, could properly be considered as part of the allegedly slanderous statement, but was part of the background which could be considered in determining whether or not the words ''son of a bitch'' could reasonably carry a defamatory meaning within the sense of Civil Code, section 46, subdivision 3. We, too, will consider the mention of a car as not being part of the alleged slander, but, to prevent any misunderstanding, we further state that we would reach our conclusions regardless of whether or not the word ''car'' was used at all.

Appellant's contention that unless the words used are defamatory without the pleading of extrinsic facts and circumstances existent at the time of their utterance, in other words unless they are defamatory ''on their face,'' special damages must be pleaded and proved, is based upon what we believe to be a misunderstanding of California law. In the English common law the question of special damages was relevant only in connection with slanders which were not classified as slander ''per se.''[5] (See Prosser, Law of Torts (3d ed. 1964) § 107, p. 772; Rest., Torts, §§ 570-574.) The problem of having to plead extrinsic facts by way of innuendo and inducement to state a cause of action where the defamatory meaning of the communication was not apparent from its face, had nothing to do with the problem of special damages. It was simply a rule of pleading which required the pleader to set forth the defamatory meaning on the face of the complaint. (See *Grand* v. *Dreyfus,* 122 Cal. 58, 61-64 [54 P. 389].) It applied to actions of libel as well as to actions

to his office, profession, trade or business that has a natural tendency to lessen its profits.

''Calling someone a Son of a Bitch does not of itself impute such disqualification but under some circumstances it might have such effect.

''Therefore, if you should find, by a preponderance of the evidence that the defendant did so refer to the plaintiff, and intended under all the circumstances to imply that the [plaintiff] was disqualified in those respects which his office, profession, trade or business peculiarly required, and that such reference was so understood by a third person or persons, the statement was slanderous.

''The words if you find them to have been spoken, must have been uttered maliciously, and with the malevolent motive, purpose and design of disgracing, degrading and defaming the plaintiff in the manner herein defined, and such malice and purpose must be proved by a preponderance of the evidence.''

[5]The particular defamatory imputations which constitute slander ''per se'' in most common law jurisdictions, were codified in subdivisions 1 through 4 of Civil Code, section 46.

of slander and to the latter whether they were slanderous "per se" or whether they required proof of special damages. (Rest., Torts, § 563; Prosser, *op.cit.*, § 106, p. 763 ff.) Starting with *Tonini* v. *Cevasco,* 114 Cal. 266 [46 P. 103], California embarked upon a new rule: In libel actions, if the defamatory meaning of the language used was not apparent on its face, averment and proof of special damages were required. *Tonini* was later modified by *Schomberg* v. *Walker,* 132 Cal. 224, 227-228 [64 P. 290]. Both *Tonini* and *Schomberg* involved libels. Strangely, as far as slander actions were concerned, the rule of *Tonini* was apparently never applied. In *Jarman* v. *Rea,* 137 Cal. 339 [70 P. 216], a slander case, the Supreme Court expressly held that damages would be presumed and that special damages need not be pleaded or proved although to make the words actionable an inducement had to be pleaded: "Where the words are actionable in themselves there is no occasion for [*sic*] inducement to be alleged, but where the words are not actionable they may be made so by the inducement, and it is then no more necessary to allege special damages than where the words are actionable in themselves. So long as they are made actionable by appropriate pleading, it is immaterial whether this comes about through the words themselves or through the words coupled with the inducement." (*Ibid.* p. 345.) This anomalous situation which required the pleading and proof of special damages in libel actions if the defamatory meaning was not apparent on the face of the communication, however heinous the imputation to plaintiff's character in the light of extrinsic circumstances, but allowed recovery of general damages in slander actions, as long as the innuendo and inducement brought the defamatory meaning within the first four subdivisions of Civil Code, section 46 has been severely criticized. (See Carpenter, *Libel Per Se in California and Some Other States,* 17 So. Cal. L. Rev. 347.) Although according to Professor Prosser, some 35 states have departed—like California—from the common law in that they require pleading and proof of special damages where libels are not defamatory on their face, it seems that a large number of them do not require such pleading and proof where they would not do so if the action sounded in slander. (Prosser, *op.cit.*, p. 782.) California as we have seen is not one of the latter. *Jarman* v. *Rea, supra.*[6]

---

[6] We have carefully researched all California cases discussing section 45a and find that the only case in which the section was mentioned in connection with slander, rather than libel, was *Washer* v. *Bank of*

In Professor Carpenter's article, noted above, he characterized the new doctrine as a "misbegotten monster" and said that he was writing his article for the "benefit of lawyers and courts of the States that have produced the new offspring, so that they may see that it is a new creature, and that it is ugly and illegitimate and ought promptly to be strangled." (*Ibid.*, p. 347). Our Legislature, feeling perhaps that the courts might help the author achieve his purpose, legitimized the offspring by enacting Civil Code, section 45a.[7] Finally in 1959 our Supreme Court gave it eminent social standing in *MacLeod* v. *Tribune Publishing Co.*, 52 Cal.2d 536, 548-550 [343 P.2d 36]. The purpose of the doctrine was said to be to protect publishers "who make statements innocent in themselves that are defamatory only because of extrinsic facts known to the reader." (*Ibid.*, p. 550).[8]

---

*America*, 21 Cal.2d 882 [136 P.2d 297, 155 A.L.R. 1338]. There are various reasons why we cannot consider *Washer* as authority for applying section 45a to slander actions: 1. The point was neither raised nor discussed; 2. The plaintiff did in fact plead special damages; and 3. One part of the slander was held by the court to be slanderous per se without innuendo. The other part was held to require an innuendo under the rule of *Peabody* v. *Barham*, 52 Cal.App.2d 581 [126 P.2d 668], subsequently disapproved in *MacLeod* v. *Tribune Publishing Co.*, 52 Cal.2d 536, 551 [343 P.2d 36].

[7]"A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code."

[8]This explanation of section 45a would not have been possible before *MacLeod* was decided. As noted, the case also overruled and disapproved several decisions following the rule of *Peabody* v. *Barham*, 52 Cal.App.2d 581 [126 P.2d 668], that a libel could not be defamatory "on its face" if the language was susceptible of an innocent interpretation. Under that rule a statement that the plaintiff had married his aunt had been held not to be libelous per se because the lady might have been his uncle's widow. (*Peabody* v. *Barham, supra*). Similarly, a statement that the defendant had falsified an expense account was held to require an innuendo, because the falsification might have been accidental. (*Washer* v. *Bank of America*, 21 Cal.2d 822, 828 [136 P.2d 297, 155 A.L.R. 1338]). Whatever may be the rule concerning such statements being libelous per se, they certainly are not "innocent in themselves." While *Peabody* was the law the explanation of section 45a given in *MacLeod* simply would not have fit a great many defamers who obtained the benefit of the section for the sole reason that somebody was able to think of an innocent meaning which was never intended by the defendant. There still remains the problem of the libel which is entirely innocuous on its face, but becomes defamatory because of extrinsic facts which are known to the writer. If section 45a is only intended to protect publishers who are unaware that their writings may be interpreted in a defamatory sense, it should not apply in the situation last mentioned, but the section, on *its* face, makes no such distinction.

Parenthetically it should be noted that the rule of *Tonini* and *Schomberg* is today not quite as illogical as it was before: In 1896, when *Tonini* was decided, the easiest way to reach a mass audience was through writings. A rule of law which made it more difficult to state a cause of action for libel than for a spoken utterance certainly was an anomaly in those days. Today the easiest way to defame a person within the hearing of millions is by radio and television which, in California, are deemed slanders. Thus has technology, in part at least, rectified a legal oddity.

It could of course be argued that the word "libel" in section 45a is used broadly to include all defamatory statements, oral or written. This interpretation is impossible to accept, in view of the clear distinction made between libel and slander by the Legislature throughout the code sections dealing with defamation (Civ. Code, §§ 44-48.5) and particularly in light of the fact that the very same chapter of the statutes of 1945 which contained section 45a also made significant changes in section 48a in which the difference between libel and slander is expressly recognized.

It follows therefore that appellant's premise is unsound. If by way of innuendo and inducement the words spoken by him are fairly susceptible of a defamatory meaning within the boundaries staked out by Civil Code, section 46, subdivision 3, no special damages had to be pleaded or proved.

As we read the record appellant has never taken the position, either below or in this court, that the words "son of a bitch" cannot acquire a defamatory meaning through extrinsic facts. We have carefully read the contentions made in his motion for judgment on the pleadings, in his brief in support of his motion for judgment notwithstanding the verdict and in his briefs before us and find that it is conceded that under proper extrinsic circumstances the words in question could reasonably be understood in a defamatory sense.[9] We agree. Literally, of course, the words "son of a bitch," spoken of a human being, imply a miracle of nature. As a practical matter, they are sometimes used, as appellant points out, with a wide variety of meanings, ranging from joviality and endearment to various shades of opprobrium. It seems clear from appellant's general demeanor when approaching respondent that he did not intend to be endearing.

---

[9]Thus appellant argued to the superior court: "It is only when plaintiff pleads the phrase "you son-of-a-bitch" and *extrinsic facts* that the alleged defamation can take form and meaning."

Although there are many cases which deal with the use of the word "bitch" when addressed to a female, cases discussing the defamatory meaning of "son of a bitch" are surprisingly few.[10] The only case involving the use of the words "son of a bitch" addressed to a male plaintiff which we have found is *Ringgold* v. *Land,* 212 N.C. 369 [193 S.E. 267]. That case merely holds that these words, without more, do not impute that the plaintiff was guilty of a crime and are therefore not actionable without special damages. There are several other cases involving female plaintiffs who, unaccountably, have been called "son of a bitch." The question in each of those cases is merely whether or not the words can impute a lack of chastity, which is answered by various courts in various ways.

 In spite of appellant's apparent concession that under appropriate extrinsic facts the words uttered by him can take on a defamatory meaning, the point is troublesome, but after giving the matter considerable thought, we have come to the conclusion that the trial court's affirmative answer was correct.

At the time when the words were spoken respondent was engaged in one facet of his calling, he was trying to sell automobiles to what he hoped was a large home audience. Into this familiar tableau steps an angry man who, with menacing gestures, hurls the subject epithet at the speaker. We cannot say that the television viewer's conclusions of the defamatory meaning of his language were unreasonable under the circumstances. Nor can we agree with appellant's argument which, if we understand it correctly, is to the effect that the implications adverse to respondent drawn by this witness are not such as to impute to him a general disqualification in those respects which his occupation "peculiarly" requires, as the language of Civil Code, section 46, subdivision 3, demands.[11] Appellant appears to argue that unless the im-

[10]*Martin* v. *Sutter,* 60 Cal.App. 8 [212 P. 60], heavily relied on by appellant involved a female plaintiff. Language in the case dealing with the words used by appellant is therefore dictum. Further the case merely says that "bitch" is not actionable per se without the pleading of an inducement or an innuendo. The holding of the case, actually, is based upon a special finding by the jury to the effect that the defendant did not intend to imply that the plaintiff was an unchaste woman. To that extent the case is probably no longer the law. See footnote 14 *infra.* In any event, if the case is read as standing for the proposition that the word "bitch" cannot ever acquire a defamatory meaning, it seems to be impliedly overruled by *Meyers* v. *Berg,* 212 Cal. 415 [298 P. 806].

[11]Civil Code, section 46, subdivision 3, poses requirements which can be met in the alternative: By imputing to the plaintiff a general disqualification in those respects which his occupation peculiarly requires or

plication of the language is such as to impute a disqualification in those respects which the plaintiff's occupation—and none other—requires, the statutory standard is not met. We do not read the cases as imposing so strict a requirement. For example, in *Swan* v. *Thompson*, 124 Cal. 193 [56 P. 878], the Supreme Court found section 46, subdivision 3, satisfied when defendant said of plaintiff, a master mariner, that he was in the habit of getting drunk. While we, of course, agree with the Supreme Court that the occupation of a master mariner "peculiarly requires a man who is not in the habit of getting drunk," it is obvious that there are many other callings in which sobriety is not only desirable but necessary.[12]

Imputations of the lack of other qualities common to several occupations have been found sufficient under section 46, subdivision 3. Imputations of a lack of honesty when made of a clerk (*Butler* v. *Howes*, 7 Cal. 87), a city councilman (*Jarman* v. *Rea*, 137 Cal. 339 [70 P. 216]) and a jeweler (*Williams* v. *Seiglitz*, 186 Cal. 767 [200 P. 635]), have met the test. Just why an imputation of dishonesty and lack of integrity should not be actionable on the part of a railroad commissioner, is hard to say, but that was the holding in *Rea* v. *Wood*, 105 Cal. 314 [38 P. 899].[13] That case must be deemed impliedly overruled by the later decisions cited.

To the member of the audience who testified, the words used by appellant meant that he was an aggrieved customer

---

by imputing to him something with reference to his trade or business that has a natural tendency to lessen its profits. It seems clear to us that the implications which can reasonably be drawn from the language used under the circumstances of this case fall within the second of these alternatives and no further discussion would be needed. Unfortunately the key instruction previously quoted, though properly defining slander in terms of section 46, subdivision 3, does not, in its closing paragraph, permit the jury to find appellant's remarks slanderous in the sense that they may have had a natural tendency to lessen respondent's profits. We therefore assume that the jury followed the instruction and found appellant liable by the only avenue open to them, that is to say, by finding that his remarks imputed to respondent a general disqualification in those respects which his occupation peculiarly required.

[12]The following have been judicially found to require sobriety as a quality peculiar to their calling: attorneys (*Sanderson* v. *Caldwell*, 45 N.Y. 398 [6 Am.Rep. 105]); physicians (*Amick* v. *Montross*, 206 Iowa 51 [220 N.W. 51, 58 A.L.R. 1147]); teachers (*Darling* v. *Clement*, 69 Vt. 292 [37 A. 779]); ministers (*Dod* v. *Robinson*, 82 Eng. Reprint 917); carpenters (*Fitzgerald* v. *Geils*, 32 N.Y. Supp. 306); firemen (*Gottbehuet* v. *Hubachek*, 36 Wis. 515); members of election board (*Reilly* v. *Curtiss*, 83 N.J.L. 77 [84 A. 199]).

[13]It seems arguable that James W. Rea who, as plaintiff, lost *Rea* v. *Wood* was lulled into a false sense of security when trying to draw what comfort he may from his defeat, he libeled the plaintiff in *Jarman* v. *Rea*.

and that if one bought a car from respondent one might expect unfavorable treatment—in other words that he lacked the qualities of fair dealing with the public which his occupation demanded. ▮ We have no hesitation in saying that the occupation of selling new and used cars demands fair dealing on the part of the seller to an unusual degree. The relative helplessness of the buyer because of his lack of expert knowledge of the quality of the merchandise offered is a matter of common knowledge. ▮ The trial court therefore correctly informed the jury that under some circumstances appellant's words might carry a defamatory meaning.

▮ Appellant's final contention is that by the instruction quoted in footnote 4 the court erroneously permitted the jury to determine whether the words "you son of a bitch" constitute slander per se. The validity of this argument depends entirely on the correctness of our discussion concerning appellant's second point. If the words spoken cannot possibly acquire a defamatory meaning viewed against the background in which they were spoken, the court should have ruled so as a matter of law, and appellant was entitled to a dismissal of the action. But since appellant's language was reasonably susceptible of a defamatory interpretation, the entire point falls. ▮ Appellant is correct, of course, in arguing that the question whether or not a defamatory interpretation is reasonable is for the court. (*MacLeod* v. *Tribune Publishing Co., supra,* at p. 546). That ruling was made by the court in the instant case when it instructed the jury as follows: "Calling someone a Son of a Bitch does not of itself impute such disqualification but under some circumstances it might have such effect." Then the court went on to tell the jury in terms which were actually more favorable to appellant than necessary[14] that if they found his words were understood in their

---

[14]The instruction required the jury to find that appellant intended the defamatory meaning. Although there is authority in California to support this statement (*Meyers* v. *Berg,* 212 Cal. 415, 418 [298 P. 806]; *Martin* v. *Sutter,* 60 Cal.App. 8 [212 P. 60]), the requirement is contrary to other cases (*Davis* v. *Hearst,* 160 Cal. 143, 154 ff. [116 P. 530]; *Carl* v. *McDougal,* 43 Cal.App. 279 [184 P. 885]) and the great weight of authority. (Rest., Torts, § 580; Prosser on Torts (3d ed. 1964) 791-793). The rationale of Civil Code, section 45a announced by the Supreme Court in *MacLeod* v. *Tribune Publishing Co.,* namely that it protects "publishers who make statements innocent in themselves that are defamatory only because of extrinsic facts known to the reader" would be most unjust, unless it is assumed that the publisher referred to is innocent of any intent to defame.

defamatory sense, the words were slanderous. This is precisely what *MacLeod* requires.

Although appellant does not mention it as a separate point on appeal, there is complaint made that the damages are excessive and respondent meets the point in his brief. We cannot consider the point for the very simple reason that in his proposed settled statement appellant never referred to it. Under California Rules of Court, rule 7(a), he is therefore precluded from arguing the question.

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 30, 1965.