MALOUF v. METROPOLITAN LIFE INS. CO. et al.

No. 4763. Decided December 18, 1929. (283 P. 1065.)

*Woolley & Holther* and *Jeppson & Nebeker,* all of Ogden, for appellant.

*De Vine, Howell, Stine & Gwilliam,* of Ogden, for respondents.

STRAUP, J.

This action was brought to recover damages for an alleged libel. It was brought against the Metropolitan Life Insurance Company and S. V. Prows, its local manager at Ogden, Utah. Separate general demurrers were interposed to the complaint by each of the defendants. The Metropolitan Life Insurance Company also interposed a special demurrer, but on the sole ground that it was not sufficiently alleged that Prows as its agent and manager was authorized to compose or publish the alleged libelous article, and that the allegations in such respect are ambiguous and uncertain. In no other particular was it claimed that the complaint was uncertain or ambiguous. The demurrers, both general and special, were sustained, and the action dismissed. The plaintiff appeals.

In the complaint it, among other things, is alleged that the plaintiff, at Ogden, Utah, for many years, was engaged in the life insurance business; that at the time of the alleged libel, and prior thereto, he, at Ogden, was the manager of a branch office of the Beneficial Life Insurance Company, and that the defendant Prows, at Ogden, was the manager of a branch office of the Metropolitan Life Insurance Company; that Heber J. Grant, the person to whom the alleged libelous article was addressed, "was the president of the Beneficial Life Insurance Company and was then the superior of the plaintiff in his said employment of which the defendants then knew"; that "the said defendants maliciously composed and published and caused to be composed and published of and concerning the said plaintiff and of and concerning him in his said capacity and profession of manager of the Ogden branch of the Beneficial Life Insurance Company, in a certain letter written by said defendant Prows as the agent of and under the direction of and for said defendant Metropolitan Life Insurance Company and delivered to and read by Heber J. Grant and by divers other persons, the following false and defamatory matters:

" 'Ogden, Utah, December 3, 1926.

" 'Mr. Heber J. Grant, 201 8th Ave., Salt Lake City, Utah. Dear Sir: I am taking this opportunity to inquire if you know that your name is being used unscrupulously by representatives of the Beneficial Life Insurance Company in this city, and I would call your attention to a few very important facts.

" 'In the first place, the name, Heber J. Grant, is an honored and respected name, and carries a lot of influence, both in a business and ecclesiastical way, and knowing you as I do, being a member of the L. D. S. Church, I cannot help but be chagrined as I view the situation.

" 'I do not know the percentage of stock of the Beneficial Insurance that the church holds, but I would advise you that it is the general opinion of the public that the church owns the Beneficial Life Insurance Company, and it is guided by President Heber J. Grant, the president of our church. The representatives of that company are taking every advantage of the public's opinion, and are using our church as a cloak of armor to protect and shield their unethical tactics.

" 'You know what a wonderful company the Metropolitan Life Insurance Company is, as I have heard you congratulate her and admit that it is the most wonderful company in the world at our tri-annual convention in Salt Lake City, and I have enough confidence in you as an honorable gentleman to know that you would not tolerate such dishonorable methods in business. These are the facts as I find them:

" 'We were compelled to reduce our force and it meant a demotion of assistant manager to the ranks of an agent. Of course it made him feel badly, but he was willing to give up the rights and privileges togther with eight long years of service to accept the managership of the Beneficial Life Insurance Company in this city. He was influential in taking with him about ten agents, all of them being L. D. S. boys, but one whom he made his assistant. The point is that these two managers employed by the Beneficial Life Insurance Company are Roman Catholics, and they are being led into the L. D. S. homes especially by our L. D. S. boys, homes that they could not go in themselves only by the introduction of L. D. S. boys and use their ability as salesmen together with their lack of respect of law, they are using the church and your name to influence, the people to drop their insurance they have carried in many cases for years to take Beneficial.

" 'This matter of twisting, etc., has been taken up with our state insurance commissioner, but due to some unforeseen influence, or association, his hands seem to be tied, and he refuses to act, using an alibi that Ordinary insurance is replacing Industrial insurance,

and even expresses his ignorance as to Industrial being written on adults.

"Ordinary insurance is not replacing Industrial insurance and I would quote you from our Underwriters Report that even though Ordinary insurance has made a gain of 3% in this state this year, there has been a gain of 12% in Industrial, and there will always be a need for Industrial insurance because of its convenience, and the wonderful work that we are doing with our policy holders in Welfare proves that among this class of insurance our policy holders are living four years longer than the average public; you know the blessedness of Industrial insurance.

" 'I have endeavored to give you the important facts as I find them and I would deem it an opportunity to personally interview you on this subject if necessary. However, I would appreciate, in any event, your serious consideration and investigation of the unlawful, unethical tactics employed by the representatives of the Beneficial Life Insurance Company of this city, as it hurts me to see our church and its president used to deceive the public and as a whip to slaughter honorable business, and unless there is action taken, I fear the outcome. As a member of the Church of Jesus Christ of Latter Day Saints, I appeal to you for your usual intelligent leadership.

" 'Thanking you for your serious consideration in this matter, and hoping that I may hear from you at your earliest convenience, I am yours very truly, S. V. Prows. S. V. Prows Manager.' "

The letter was written on a letterhead of the Metropolitan company.

It is further alleged that, by reason of the publication, the plaintiff was injured in his good name and reputation and in his "said profession and in his said employment," and was held up to public hatred, contempt, and ridicule, to his damage in a stated sum for which amount judgment was prayed.

Thus, when the complaint, including the alleged published article, is considered as a whole, the essence of the complaint is that the defendants, with malice, published the alleged false and defamatory matters, and delivered and caused them to be delivered to the president of the Beneficial Life Insurance Company with the motive and purpose to injure and prejudice the plaintiff in his business and in his employment as manager of the branch

office of the Beneficial Life Insurance Company and to discredit him in the eyes of his employer as well as of the public. We think such purpose and motive so manifest that no innuendo is needed to make them clear and evident. It being alleged in the complaint that "the said defendants," both the defendant Prows and the defendant Metropolitan Life Insurance Company, maliciously composed and published the article, and that it was written by Prows as the agent of "and under the direction of and for the said defendant Metropolitan Life Insurance Company, and delivered to, and read by Heber J. Grant, and by divers other persons," we think the special demurrer ought to have been overruled, and that the court erred in sustaining it.

This brings us to the general demurrers that sufficient facts are not stated in the complaint to constitute a cause of action. The proposition thus is, Does the complaint, which in effect charges that the defendants, with malice, composed and published the alleged false and defamatory matters of and concerning the plaintiff in his business and in his employment and delivered the article to his employer, to the president thereof, and as alleged, the superior of the plaintiff in his employment, and that the plaintiff, by reason thereof, was injured in his business and in his employment, the character of which is fully described in the complaint, constitute a cause of action?

In support of the ruling sustaining the demurrers, it in substance is contended that, though the alleged false accusations or defamatory language, or some of it, contained in the published article, that the plaintiff and other representatives of the Beneficial Life Insurance Company used the church "as a cloak of armor to protect and shield their unethical tactics," "unscrupulously used" the name of the president of the church and of the Beneficial Life Insurance Company, engaged in "dishonorable methods in business," with a "lack of respect of law," used the church and the name of its president and of the president of the Beneficial Life Insurance Company "to influence the people to drop

their insurance they have carried in many cases for years to take Beneficial" life insurance, and by "unlawful and unethical tactics" used the church and its president "to deceive the public" and "slaughter honorable business," standing alone, might be regarded of such derogatory and defamatory character as to give rise to a charge of libel, yet, when considered in connection with the whole article and with the general purport and intent thereof, the article as published is not libelous per se, and hence no cause of action is stated, because, as contended, special damages are not averred. In other words, it is the contention in support of the rulings that, when the alleged defamatory and derogatory language is considered in connection with the whole article, as it should be, it relates only to matters and things not unlawful or wrongful, but entirely legitimate and to what the plaintiff had the right to do, and hence his conduct in the charged respect was not open to the alleged defamatory and derogatory terms in their ordinary or usual meaning. In support of that the case of *Donaghue et al.* v. *Gaffy*, 53 Conn. 43, 2 A. 397, among other cases, is especially cited. In the Connecticut case the plaintiffs, as partners, were wholesale liquor dealers. The defendant, a retail dealer, for a time purchased liquors from them, and then purchased liquors from others. The plaintiffs thereafter obtained a lease from the owner of premises occupied by the defendant by paying as rental $10 more a month than was paid by the defendant. At the end of the defendant's lease, the plaintiffs served him with notice to vacate. Based upon such transactions and none other, and as found by the court, the defendant by circulars distributed by him charged the partnership composed of the plaintiffs with "base treachery" and "foul and unfair dealings." A trial of the case to a jury resulted in a verdict and judgment in favor of the plaintiffs, from which the defendant appealed. The appellate court held that, obtaining the lease by the plaintiffs from the owner of the premises, being "a perfectly lawful transaction," and it appearing on the face of the publication that

the epithets, "base treachery" and "foul and unfair dealings" were based alone on such transaction, no libel per se was shown and no legal presumption of injury or damage could be implied. There are other cited cases which in the principle are to the same effect.

The principle of law so stated may well be conceded. Certainly, if one should falsely publish of a merchant or trader that he was a cheat and a scoundrel because he sold goods at cost and below the general market value, no libel per se is charged because the derogatory terms, based alone upon a circumstance or transaction itself entirely legitimate and proper, and upon something which the libelant had the undoubted right to do, have, on the face of the published article, not their ordinary meaning. If, therefore, the false charge in the alleged libelous article in hand, that the plaintiff "by unlawful and unethical tactics" used the church and the name of its president and of the president of the Beneficial Life Insurance Company to "deceive the public," and "slaughter honorable business," and with "a lack of respect of law" used the church to induce "people to drop their insurance" with other companies and take insurance with the Beneficial Life Insurance Company, is not "unscrupulous" or "a dishonorable method in business," or otherwise not wrongful, but entirely legitimate and proper, then not much more need be said on the subject in such respect. However, we cannot yield to the proposition that by "unlawful and unethical tactics" to use the church and the good name of its president and of the president of the Beneficial Life Insurance Company, no matter by what means or in what manner they were unlawfully used, "to deceive the public" and "slaughter honorable business," is a legitimate or proper thing to do, or that "to deceive the public," no matter by what means employed, is legitimate or proper, or something which the plaintiff had the right to do, and is not "dishonorable," deceitful, fraudulent, or wrongful.

We thus think the Connecticut case and other cases to the same effect have no application. The Connecticut case, how-

ever, deserves further consideration. While the court there held, for the reasons stated, that the published article was not libelous per se, so that the law implied malice and injury, nevertheless it did not hold that on averments and proof of malice the plaintiff could not recover. The alleged libel there charged the partnership or firm of Donaghue Bros. with base treachery, etc., rather than the members of the firm as individuals. The complaint, said the court, could not be regarded as a libel on the plaintiffs as individuals, for that would be objectionable, because to so regard the complaint would make the action a joint claim which in its nature was several; that, regarding the action as brought by the partnership, damages could not be recovered for an injury to private feelings of the members composing the firm; that the only damages claimed or proven, and the only damages allowed by the jury, were for "mental suffering"; that a partnership could not have "mental suffering"; and therefore there was no evidence to support the verdict, and thus the judgment was reversed and the case remanded for a new trial.

*Nichols* v. *Daily Reporter Co.,* 30 Utah 74, 83 P. 573, 3 L. R. A. (N. S.) 339, 116 Am. St. Rep. 796, 8 Ann. Cas. 841, also is cited. There the plaintiff and one Bosch, both members of a typographical union at Salt Lake City, were candidates for a delegate to a convention of the National Union to be held in Washington, D. C. The defendant, the Daily Reporter, printed and distributed among members of the local union a card on one side of which were the words "Vote for honest Jake Bosch for delegate." On the other side the words, "Explanatory. Mr. C. A. Nichols owes the Daily Reporter Co. a balance of $34.25 for printing done in 1894. Draw your own conclusions and vote for Mr. Nichols, if you think he is not able to pay this debt." A trial resulted in a verdict and judgment in favor of the plaintiff for $1 from which he appealed, claiming that the verdict was inadequate and that the court erred in charging the jury that the alleged

words were not libelous per se, and that no damages could be inferred from the mere fact of the publication and that the matters published were false. This court approved the charge in such particular, and held the alleged article was not libelous per se, and, as no special damages were averred and none proven, the plaintiff was not entitled to a verdict. But let it be noticed that no allegation or proof was made that the publication was made maliciously. It was merely alleged that the card was printed and published by the defendant. When a false published article is libelous per se, malice and necessary resulting injury will be presumed, and thus neither are required to be alleged, except a general averment of damage.

Thus, in the Nichols Case, the published article not being per se libelous, malice could not be presumed or implied from the publication, and, there being no allegation that the publication was made with malice, the element of malice was not present either by presumption or averment. But, in the case in hand, malice is alleged as a matter of fact. Thus, to entitle the plaintiff to prevail, he was not required to rely on a presumption of malice. The allegation that the article was maliciously composed and published is sufficient to charge malice in fact or actual malice. 3 Bancroft, Code Plead. 2922. Hence what with respect to malice could not legally be presumed, if the alleged published article be regarded as not libelous per se, was alleged as a matter of fact. Because no legal presumption of malice may be indulged from an alleged published article does not prevent the libelant from averring and showing that the article was in fact composed and published with malice. In other words, a libel per se is actionable by presumption—by presuming malice and injury—and, when not libelous per se, may become actionable by averments, by averring what may not be implied or presumed without averments. In 17 R. C. L. 321, it is stated that words not actionable per se are in many instances rendered actionable by allegations and proof of malice. Let it also be observed

that the published article in the Nichols Case was not of or concerning the business, trade, or employment of the plaintiff. Such element alone is sufficient to distinguish this from that case.

Thus, if one with actual malice publishes false and defamatory matter of and concerning one in his business, trade, profession, or employment, and of such a character as calculated to do harm, we do not well see why he should not be held liable, if injury as a direct consequence of the publication resulted. It being alleged that the defendants, with malice, composed and published the false and defamatory article of and concerning the plaintiff in his business and employment, delivered and caused it to be delivered to his superior, and the defamatory matter being of such character as is calculated to do harm, and that by reason of such publication, and as a direct consequence thereof, the plaintiff, among other things, was "injured in his said employment," the character of which is fully described and alleged, we think a cause of action is stated. It may be that the allegation of damage that the plaintiff was "injured in his said employment" is, as against a special demurrer, not sufficiently certain and specific notwithstanding the character of the employment is fully alleged, but no such demurrer on such ground was interposed. In the absence of a motion or special demurrer to make the allegation more certain and specific, the plaintiff thereunder would be permitted to prove that, because of the publication, he was dismissed from service, or lost his position, or, if not injured in his employment to that extent, the extent to which he therein was injured.

And further as to this: It is well recognized by judicial authority that it frequently is difficult to determine when alleged damages are general and when special. The allegations that the plaintiff was injured in his good name and reputation and was held up to public hatred, contempt, and ridicule may well be regarded as general damages. But how about the allegation that the plaintiff was injured "in his

said employment," the character of which is fully described, together with the allegation that the published article was delivered to the president of the company of which the plaintiff was the local manager? Had it been alleged that, by reason of the publication, the plaintiff was dismissed from service or lost his position, such an allegation might well be regarded as special damages, because of consequences of an injury peculiar to the alleged circumstances or condition of the plaintiff with respect to his employment. 17 C. J. 715; Newell, Libel & Slander (3d Ed.) 1030; Odgers, Libel & Slander (5th Ed.) 378. If that be true, we think it follows that the allegation that the plaintiff was injured in his employment, though defective, likewise could be regarded as an allegation of special damage. In such view, though the published article be regarded as not libelous per se, yet was actionable because of such allegation of special damage.

However, it is not necessary to rest a reversal of the judgment on the ground of any alleged special damages, for the reason that the authorities generally are to the effect that false and defamatory matter calculated to do harm, and published of and concerning another's trade, profession, or employment, is libelous per se, 36 C. J. 1180 et seq., Odgers, Libel & Slander (5th Ed.) 371, entitling the plaintiff to general damages. When therefore the derogatory and defamatory matter here is considered in connection with the whole article, and that it, as appears on the face of it, was published of and concerning plaintiff in his business and employment, and delivered to the president of the company of which the plaintiff was the local manager, with the manifest purpose to discredit and injure the plaintiff in his employment, we think it libelous per se. It is recognized that some defamatory and derogatory matter published merely of and concerning one generally may not be of such character as to be libelous per se, yet, when published of and concerning his business, profession, or employment, may well be so regarded.

It further is well recognized that written or printed matter which falsely charges another with the commission of a crime is libelous per se whether the crime is a felony or only a misdemeanor. 36 C. J. 1192. We have a statute (Comp. Laws Utah 1917, § 1166) making it a misdemeanor for any agent or officer of an insurance company to "make any misrepresentation to any person insured in another company for the purpose of inducing or tending to induce such person to lapse, forfeit, or surrender his said insurance." The published article, among other things, charges that the plaintiff, with a "lack of respect of law," used the church and the name of its president and of the Beneficial Life Insurance Company "to influence people to drop their insurance that they carried in many instances for years to take Beneficial" life insurance. It is urged that did not charge any "misrepresentation," that the language consists of statements of fact and not of misrepresentations, and hence the language did not charge a commission of the offense. In order that language may be actionable as charging a crime it is not essential that the language should impute the offense with the accuracy or precision of an information or criminal complaint, or that the charge be made in any direct terms. It is sufficient if the crime be imputed in language which denotes the offense, or if couched in such language as might reasonably be expected to convey the meaning to those who happen to hear or read it that the plaintiff had committed the offense. *Jarman* v. *Rea,* 137 Cal. 339, 70 P. 216, 217, 36 C. J. 1162. To impute the offense, it was not necessary that language be employed that the plaintiff made misrepresenations to induce others to lapse or surrender their insurance. It is enough if the language employed fairly conveys a meaning imputing such an offense to the plaintiff. It, however, is further urged that the making of a misrepresentation was an essential ingredient to constitute a violation of the act. That may be true were the language to be measured with the precision of a criminal complaint. But the defendants were not pros-

ecuting attorneys skilled in drawing complaints or informations charging criminal offenses. If the language employed was intended to convey, and fairly conveys, the meaning that the offense was committed, that suffices, although such language, when employed in a complaint in a criminal action, would fall short of stating the offense. Often by speech or by writing in most general terms the commission of an offense is imputed to another without stating any of the essentials or particulars constituting the offense. So, here, language may be employed to impute to another a commission of the offense referred to without stating that misrepresentations were made, or other particulars constituting the offense. The question is, Did the defendants, by the language employed, intend to impute to the plaintiff the commission of the offense referred to, and does the language employed fairly convey that meaning? That, we think, should be answered in the affirmative. We do not well see what other meaning may be given it. Had the defendants employed language that the plaintiff unlawfully, or in violation of law, influenced or induced others to drop their insurance in other companies and take Beneficial life insurance, we think it clear that the commission of the offense referred to was intended to be imputed to the plaintiff, though by the language employed it was not stated that any misrepresentations were made. In effect that is what is fairly implied from the language employed by the defendants. The language that the plaintiff with a "lack of respect of law" influenced or induced others to drop their insurance to the lay mind is equivalent to language that he did that in disregard of law, did it unlawfully. The language that the plaintiff with a lack of respect of law, in disregard of law, unlawfully, used the church and the name of its president to influence or induce others to drop their insurance and take Beneficial life insurance, does not detract from the imputation of the offense. By the language employed the gist of the imputation is that the plaintiff in disregard of law, in violation of law, influenced or induced

others to drop their insurance to take Beneficial life insurance; and that the plaintiff accomplished such unlawful acts by means of using the church and the name of its president does not minimize the imputation.

Further, to constitute a misrepresentation it is not always essential that it consist of a false statement of some material existing or past fact. That, in some instances is essential. In others the misrepresentation need but be that which, if accepted, leads the mind to an apprehension of a condition other and different from that which exists, and oftentimes may be mere conduct with the intent to deceive or mislead and which leads to a belief of a substantive fact material to a proper understanding of the matter in hand. (Words and Phrases, First, Second and Third Series, Misrepresentation.) The language employed may well imply that kind of a misrepresentation. However, when the language is considered in connection with the further language, that the "unlawful and unethical tactics" employed by the plaintiff "to deceive the public" be investigated, it seems quite clear that the language employed was intended to impute, and fairly does impute, to the plaintiff the commission of the offense referred to. The charge that the plaintiff by "unlawful and unethical tactics" used the church and the name of its president "to deceive the public" again does not minimize the imputation, for again the gist of the charge in such respect is that the plaintiff employed unlawful and unethical tactics to "deceive the public," and that the church and the name of its president were used to accomplish the deception and wrongful acts does not detract from the imputation, for it is inconceivable how the use of the church or the name of its president by whatever means or manner they were or may be used "to deceive the public" and to accomplish the deception is legitimate and not wrongful and fraudulent, for all deceptions, if substantive, are wrongful and fraudulent, no matter what means were employed to accomplish the deception.

Though the language, when considered in connection with the whole article, should be regarded as not sufficient to impute the commission of the offense referred to, nevertheless, when it also is considered, and as appears on the face of the published article, that it was composed and published of and concerning the plaintiff in his business and employment, and delivered to the president of the company of which the plaintiff was the local manager, it directly tends to the prejudice and injury of the plaintiff in his business and employment and to expose him to the hazard of losing his employment in consequence of the publication. Under such circumstances we think the publication was libelous per se. 36 C. J. 1180, and other authorities heretofore cited. In such case to be per se libelous it is not essential that the language employed should involve an imputation of crime or otherwise impute a violation of law or moral turpitude or immoral conduct. 36 C. J. 1164. It is enough if the language imputes discredit or fraud or tends to disparage or discredit the plaintiff in his employment; and the rule making words actionable which tend to disparage and discredit one in his official capacity is extended to officers or agents of private corporations or associations. 36 C. J. 1183.

It also is familiar doctrine that no strict rule of law may be laid down in distinguishing between publications which are defamatory per se and those which are defamatory per quod; the distinction being based more largely on a rule of evidence. While at common law pleadings in actions for libel and slander were highly technical (3 Bancroft, Code Pleading, 2906), and technical objections "often made the means by which justice was herself smothered in her own robes" (*Jarman* v. *Rea,* supra), yet, by Codes and statutory provisions liberalizing rules of pleading, much of ancient formalities and technicalities in actions for libel has been dispensed with.

In defense of the ruling sustaining the demurrers, a further ground is urged, that the published article on the face

of it is qualifiedly privileged. To support that, section 8080, Comp. Laws Utah 1917, is referred to. The section is:

"A communication made to a person interested in the communication, by one who was also interested or who stood in such relation to the former as to afford a reasonable ground for supposing his motive innocent, is not presumed to be malicious, and is a privileged communication."

In such respect it is contended that the letter was written by a member of the Latter-Day Saints church to its president, and "solely and wholly as a member of the church appealing to the president, as his religious leader, as his ecclesiastical superior, asking that he take cognizance of the matter, not as president of the Beneficial Life Insurance Company, but as president of the church." Little need to be said as to this. It is quite apparent the letter was not written either "souly or holy." It has not the tone of one in religious fervor pouring out his soul to his priest, or as endeavoring to save the plaintiff from perdition, or the church from spiritual ruin. It rather has the temper of an appeal to the person to whom the communication was addressed to prevent the charged "slaughter of honorable business" of the "most wonderful company in the world" by the unlawful and unethical tactics of this influential Roman Catholic who, when he left its service, took with him ten of its agents of Latter Day Saints, and entered the employ of a competitive company. The article was not even addressed to Heber J. Grant as president of the church, nor in his ecclesiastical capacity. And then it is difficult to perceive how the Metropolitan Life Insurance Company, who, as alleged, directed the composition and publication of the letter, was interested in the communication from any spiritual or ecclesiastical viewpoint or welfare. It is apparent that its interest and that of its codefendant lay in a different and in a pecuniary direction. As already observed, the manifest purpose of the communication was to prejudice and injure the plaintiff in his employment, and to enable the defen-

dants to profit in their own business. By the recitals in the communication that the writer of it was a member of the dominant church, the person to whom it was addressed, its president, as well as the president of the Beneficial Life Insurance Company, the plaintiff, a Roman Catholic, using the church and the name of its president for the purposes stated in the article, it was the undoubted thought of the defendants that by calling attention to such matters they could more readily discredit the plaintiff and the more effectually prejudice and injure him in his employment to their pecuniary advantage.

But, aside from all this, a complete answer to the claim of qualified privilege based on the face of the published article is the allegation in the complaint that the article was maliciously composed and published. ■ That alone was sufficient to ward off the general demurrer as to the claim of qualified privilege based on the face of the publication.

While the complaint may be defective in some particulars, yet, as viewed from the standpoint of modern pleading and for the reasons indicated, we are of the opinion that the complaint states a cause of action, and that the court erred in sustaining the demurrers.

The judgment of the court below is therefore reversed, and the case remanded to the district court, with directions that the case be reinstated, the demurrers overruled, and the defendants permitted to further plead. Costs to the appellant.

ELIAS HANSEN and EPHRAIM HANSON, JJ., concur.

FOLLAND, J. I dissent. Appellant in his brief states:

"The controlling question presented on this appeal is whether or not the communication from the defendants to Heber J. Grant, set forth in haec verba in the complaint, is libelous per se."

■

The law of libel is stated in *Nichols* v. *Daily Reporter Co.,* 30 Utah 74, 83 P. 573, 574, 3 L. R. A. (N. S.) 339, 116 Am. St. Rep. 796, 8 Ann. Cas. 841, as follows:

" * * * Written derogatory or disparaging words which impute to a person the commission of a crime, or degradation of character, or which have a tendency to injuriously affect him in his office or trust, profession, trade, calling or business, or which tend to degrade him in society, or expose him to public hatred, contempt, or ridicule, are libelous and actionable. It also is the well-recognized rule that when the words are libelous per se, it is not necessary to allege or prove special damages, for malice and damage are implied; * * * Still another test, and the one which we think is the correct one, and which is supported by the greater weight of authority, is, 'when language is used concerning a person or his affairs which from its nature necessarily must, or presumably will, as its natural and proximate consequence, occasion him pecuniary loss, its publication' is libelous per se. Townshend (4th Ed.) §§ 146, 147; *Fry* v. *McCord Bros.,* 95 Tenn. 680, 33 S. W. 568. * * *"

It is claimed by plaintiff in his complaint in the instant case that "by means of said publication the plaintiff was injured in his name, fame and reputation and in his said good name and credit in the said profession and in his said employment, and has been thereby held up to public hatred, contempt, and ridicule, to his damage," etc. The words specifically complained of as being defamatory are that the defendants accuse plaintiff of being "unscrupulous," using "our church as a cloak of armor to protect and shield their unethical tactics," "dishonorable methods in business," "lack of respect of law," "twisting," "unlawful," "unethical tactics," and of "deceiving the public." These words and expressions are of a derogatory character, and, standing alone, might give rise to a charge of libel. We are not, however, called upon to decide whether these words are libelous if used without context explaining them. Whether an article is libelous per se is for the court to determine, and in so doing it must look to the general purport and intent of the article published, and not to isolated expressions or words. The rule is stated in 36 C. J. 1157, as follows:

"The language alleged to be defamatory must be construed as a whole, that is, the words must be construed in connection with other parts of the conversation or published matter written or printed."

The same rule is expressed in 17 R. C. L. 313, thus:

"In arriving at the sense in which defamatory language is employed, it is proper and necessary to consider the circumstances surrounding its publication and the entire language used. Even though the plaintiff desires, he cannot confine his action to a certain portion of the statement which the defendant has made, but the latter may demand that the entire conversation be considered in determining whether or not a portion thereof is actionable. In many instances, words which are harmless in themselves may be actionable in the light of surrounding circumstances. On the other hand, words which are apparently actionable in themselves may be rendered not actionable by the surrounding circumstances."

Among the cases which support this rule are the following: *Lynch* v. *Standard Pub. Co.*, 51 Utah 322, 170 P. 770; *Times Pub. Co.* v. *Ray* (Tex. Civ. App.) 1 S. W. (2d) 471; *Peck* v. *Coos Bay Times Pub. Co.*, 122 Or. 408, 259 P. 307; *Yakavicze* v. *Valentukevicious*, 84 Conn. 350, 80 A. 94, Ann. Cas. 1912C, 1264; *Ruble* v. *Kirkwood*, 125 Or. 316, 266 P. 252. A case particularly in point is that of *Donaghue* v. *Gaffy*, 53 Conn. 43, 2 A. 397, 399. There a circular was issued instead of a letter to an individual. The plaintiffs were charged with "base treachery" and "foul and unfair dealing." The circular contained a statement of what it was claimed plaintiffs had done upon which the charge was made. The court said:

"Ought, then, the circular to be construed as containing a libel per se? We think not. All parts of the paper should be read in connection to collect the true meaning. If so read, the severe epithets applied to the plaintiffs lose all their force, except as they attempt to characterize a single transaction, which is manifestly referred to as the sole foundation for all the statements made. That transaction or 'experience,' as the circular calls it, clearly shows that the epithets 'base treachery,' 'foul and unfair dealings,' are not to have their ordinary meaning. The gist of the whole matter is thus stated by the defendant: 'I have been in the habit of buying nearly all my

goods of them for years, but because I quit buying of them they went to the Middletown Savings Bank, of which I rented my place, and offered ten dollars more a month than I was paying; and, after getting their lease of the premises, served a notice on me to immediately vacate.'

"Now all this is a perfectly lawful transaction, whatever the intention; and how can we legally presume from such a statement that the plaintiffs were thereby degraded in the estimation of acquaintances or the public, or that they suffered loss in character, property, or business?"

A reference to the letter complained of in this case shows that the writer, while characterizing certain conduct by the use of rather strong epithets has attempted to set out facts which are the grounds of the accusations. In two places the writer states that he is attempting to give the "important facts." The facts are, in substance, as follows: (a) that the defendants were compelled to reduce the force employed in the conduct of their life insurance business by demoting the assistant manager of the Ogden branch to the rank of agent; (b) that this agent then gave up his position with the Metropolitan to accept the "managership" of the Beneficial Life Insurance Company, and took with him ten agents, all of them "L. D. S. boys" but one, who was a Roman Catholic, and whom he made assistant manager; (c) that plaintiff, who was a Roman Catholic, and his assistant were being led into homes where they could not go except by introduction by the L. D. S. boys, where they used their ability as salesmen, the name of the president of the Beneficial, and the church, to influence people to drop their insurance theretofore carried and to take insurance with the Beneficial. I see nothing defamatory in the subject-matter of these facts. The writer of the letter seems to have assumed that, because it is the general opinion of the public that the Latter Day Saints church controls the Beneficial Life Insurance Company, and that the president of that church is the president of the Beneficial, it was unlawful and unethical for agents of the Beneficial to use these

facts while soliciting insurance business. I am of the opinion that the use of such information is in no manner unlawful or unethical. There is nothing in these facts set out in the letter which would lead one to believe that any improper, unethical, or illegal methods had been or were being used by the plaintiff and his socalled "L. D. S. boys" in order to obtain business for the company. I am unable to see how the language used, when considered altogther, can be said to tend in any degree to degrade the character of the plaintiff or to injuriously affect him in his calling or profession as an insurance man; and it certainly has no tendency to degrade him in society or expose him to public hatred, contempt, or ridicule. It might have the opposite tendency of showing that he was rather a shrewd business man, and had been successful in writing insurance for his company. The statements of fact made in the letter are not, in my view, in any sense libelous. It is true they are misnamed by the epithets used, but the characterization of stated acts does not enlarge or add to the expressly stated facts.

Reference has been made to the word "twisting," which it is claimed by plaintiff is a charge committing a violation of Comp. Laws Utah 1917, § 1166, wherein it is made a misdemeanor for any agent to "make any misrepresentation to any person insured in another company for the purpose of inducing or tending to induce such person to lapse, forfeit, or surrender his said insurance." We cannot take judicial cognizance of such definition of the word "twisting." Even if the word should characterize or name the misdemeanor sought to be defined in section 1166, it is clear from the reading of the letter that there is no charge in the facts stated that plaintiff was guilty of misrepresentation. The plaintiff and his insurance agents are said merely to have made statements of fact and not misrepresentations of fact in their efforts to write insurance for the Beneficial, and this conduct is not condemned by the statute.

Can it be said that the language used "was such as not only as a natural and proximate, but as a necessary, conse-

quence its publication occasioned plaintiff damages?" I do not think so. The letter raises no such presumption. On the question of special damages it is said by appellant in his brief: "There are no allegations of special damages and no innuendos." The rule is stated in 3 Bancroft, Code Pleading, § 1750, p. 2925, as follows:

"Whether the publication alleged be actionable per se or otherwise, special damages must be alleged in every case in order to be recovered. The particulars must be given with precision and certainty and the matters alleged must constitute proper elements of damage. The complaint must show of what special damages claimed consisted and that they were the result of the alleged defamatory publication. It must be made to appear by proper averments how these damages were occasioned by the publication. * * *

"Where loss to plaintiff in his business is sought to be recovered it is not enough to aver generally that in consequence of the publication the plaintiff has been damaged in his business, but the facts showing such damages must be alleged."

It was held in *Brown* v. *Independent Pub. Co.,* 48 Mont. 374, 138 P. 258, 259, that the allegation that "and that his said business has been seriously interfered with, damaged, and injured, and that his credit has been greatly injured in consequence thereof," was not an allegation of special damages. And also in *Lemmer* v. *The Tribune,* 50 Mont. 559, 148 P. 338, 339, it is said:

"The second count is an attempt to plead special damages on account of loss to plaintiff in his business. Speaking generally, there is no doubt that one may suffer such damages from almost any publication whatever, particularly a publication to the effect that he is dead; but whenever such damages are sought, it is not enough to aver generally that, in consequence of the publication, the plaintiff has been damaged in his business. The facts showing such damages must be alleged or no cause of action is stated. *Ledlie* v. *Wallen,* 17 Mont. 150, 42 P. 289; *Brown* v. *Independent Pub. Co.,* supra; *Walker* v. *Tribune Co.* (C. C.) 28 F. 828. No such facts are made to appear in the second count."

In both the last-mentioned cases general demurrers were sustained to the complaints. The allegation of damage is no

more specific or eplicit in the instant case than in these two cases.

I think the action of the district court in sustaining the demurrer should be sustained.

CHERRY, C. J. I concur in the views expressed by Mr. Justice FOLLAND in his dissenting opinion.