**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 26 2002**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

COMPUTERIZED THERMAL
IMAGING, INC., a Nevada corporation,

    Plaintiff - Appellant,

v.

BLOOMBERG, L.P., a Delaware
Limited Partnership,

    Defendant - Appellee.

No. 01-4140

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 1:00-CV-98-K)**

---

Carl F. Schoeppl of Schoeppl, Burke & Kayton, P.A., Boca Raton, Florida, (Andrew H. Kayton and Stuart A. Davidson of Schoeppl, Burke & Kayton, P.A., Boca Raton, Florida; Robert R. Wallace of Plant, Wallace, Christensen & Kanell, Salt Lake City, Utah, with him on the briefs), for Plaintiff - Appellant.

Randy L. Dryer of Parsons, Behle & Latimer, Salt Lake City, Utah, (Richard L. Klein, Thomas H. Golden and Charles J. Glasser, Jr., of Willkie Farr, & Gallagher, New York, New York, with him on the brief), for Defendant - Appellee.

---

Before **HARTZ**, **ALDISERT**[*] and **PORFILIO**, Circuit Judges.

---

[*] Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

**PORFILIO**, Senior Circuit Judge.

To propel a breast imaging technology from its development stage to the marketplace, Computerized Thermal Imaging, Inc. (CTI) sold stock in the venture, applied to the NASDAQ Stock Exchange for a national listing, and sought FDA pre-market approval. Bloomberg News reported the activity, fomenting the underlying lawsuit for libel. CTI now appeals the dismissal of that action, contending the district court erroneously interpreted Utah law and oppressively denied its motion to amend the pleadings. *Computerized Thermal Imaging v. Bloomberg L.P.*, No. 1:00CV98K, 2001 WL 670927 (D. Utah March 26, 2001) (*CTI*). In spite of the absence of a clear line of Utah substantive law, the district court did not err in concluding CTI failed to state a claim for libel *per se* or libel *per quod*, the latter defeated by the absence of a proper plea for special damages which was not achieved in its motion for relief from judgment. We affirm.

## I. Background

CTI, a Nevada corporation, is a development stage company, which promotes business ventures by selling stock to raise capital.[1] One of its products in development is

---

[1] Some of the businesses CTI lists are the integration of computer hardware, proprietary software and sophisticated heat sensing cameras to create systems that

(continued...)

a Breast Imaging System (the Project), which promised to provide higher resolution mammography to detect and treat breast cancer.

To fund the Project, CTI initiated a private placement of securities in December 1999, offering subscribers units of 13,123 shares of common stock and 13,123 warrants at a price determined on November 11, 1999. The private placement of these restricted securities included a typical discount of the market price of the stock at the commencement of the public offering as an incentive for investors, who would then bear the risk of future price volatility. CTI extended the offering until February 29, 2000, to generate more capital.

Representing it had raised $39.5 million, CTI then applied for a listing on NASDAQ and issued a press release. To shareholders meeting in June, it announced that NASDAQ approved the listing and the FDA had extended pre-market approval of the Project, driving its stock price up to $10.80 per share.

The day after the shareholders' meeting, however, NASDAQ inquired about an outstanding $25 million default judgment for racketeering and fraud against CTI's CEO, David Johnston, prompting the company to issue another press release to report NASDAQ had placed the listing on hold to investigate the matter. The following day, David Evans, a reporter for Bloomberg News, headlined his story, *Computerized Thermal Raises Capital at 72% Discount to Market,* and wrote that CTI "sold 11.1

---

[1](...continued)
produce, interpret, and catalogue computerized thermal images for medical applications.

million shares of its stock at an 80 percent discount to its market price in March, according to a filing it made with regulators last week." David Evans, *Computerized Thermal Raises Capital at 72% Discount to Market,* Bloomberg News, June 29, 2000. Mr. Evans proceeded to describe the private placement, quoting CTI's CFO, "it would have been nice for us to go out at 7 or 8 bucks" a share in the sale, instead of $2.81 but "that's not what happened." *Id.* John Coffee, a securities professor at Columbia Law School, commented for the piece, that "[r]aising capital from investors at such a large discount . . . is a red flag . . . . The market price is well above what more informed parties think it should be." *Id.* Adding that "Computerized Thermal needs the money to fund money-losing operations," and that it had "struggled to sell its $500,000 breast imaging systems," selling only one to a hospital in Thailand in 1996, Mr. Evans included statements from a radiology professor and other doctors who questioned the accuracy and efficacy of the new technology. *Id.*

CTI demanded a retraction. Bloomberg News then published a second, substantially similar article in July, *Computerized Thermal Imaging Raises Money at Discounted Price (Correct),* Bloomberg News, July 18, 2000, in which Mr. Evans principally corrected the 80 percent discount rate to read "72 percent discount" to the market price and explained that CTI extended the offering because it had not "received the minimum amount it said it needed." Both Articles (the Articles) were available on the Internet.

A month later, CTI filed suit alleging the Articles "instantaneously published over BLOOMBERG's website" contained "malicious defamation" tending to impeach the honesty, integrity, virtue or reputation of its business, and, thus, constituted libel under Utah Code Ann. § 45-2-2. The Articles, CTI alleged, led to the loss of capitalization of the Project, cancellation of ongoing efforts to expand its business into Central and South America (CTII de Mexico), disruption of its NASDAQ listing, and derailing of FDA approval. CTI sought special damages in excess of $100 million as well as punitive damages.

Bloomberg moved to dismiss the complaint, countering that the alleged defamatory statements did not constitute libel *per se* or libel *per quod* under Utah law and, in any event, were protected expressions of opinion and non-actionable fair comment under Utah and federal law. The district court agreed, focusing its analysis on five alleged defamatory statements in the Articles,[2] which, it concluded, were not

---

[2] The district court stated,

"Statement 1 reports that CTI 'sold 11.1 million shares of its stock at a 72% discount to its market price,' and includes commentary from Professor John Coffee adding that 'the market price is well above what more informed parties think it should be.'
Statement 2 reports that CTI needed to sell its stock 'to fund money-losing operations.'
Statement 3 reports that the CTI had 'struggled to sell its imaging systems,' and had at the time sold only one to a Thai hospital.
Statement 4 reports that a prospective buyer was given options in CTI stock as an 'inducement' to purchase CTI's imaging systems.

(continued...)

libelous *per se* under **Baum v. Gillman**, 667 P.2d 41, 43 (Utah 1983), an action for

slander; nor libelous *per quod*, despite the falsity of two of the statements, because CTI

neither properly pled nor proved special damages. The latter conclusion rested on **Allred**

**v. Cook**, 590 P.2d 318 (Utah 1979), an action for slander, and **Cox v. Hatch**, 761 P.2d

556, 561 (Utah 1988), an action for libel.

## II. Utah Defamation Law

Seeking de novo review of the district court's interpretation and application of

Utah law, **Field v. Farmers Ins. Co.**, 18 F.3d 831, 833 (10th Cir. 1994),[3] CTI contends

the court erred when it collapsed the separate causes of action for slander and libel into a

single, undifferentiated claim and, then, dismissed its complaint solely alleging libel.

---

[2](...continued)
Statement 5 reports on CTI's public discussion by CTI's and other medical
experts and the public's discussion of the viability of CTI's experimental
technology in comparison to traditional mammograms and biopsies."

**Computerized Thermal Imaging v. Bloomberg L.P.,** No. 1:00CV98K, 2001 WL 670927,
at *2 (D. Utah March 26, 2001) (**CTI**) (footnote omitted).

[3] In fact, CTI moved for relief from and reconsideration of the court's order under
Fed. R. Civ. P. 59(e) and 60(b), alleging, were it required "as a matter of law to plead and
prove special damages, sufficient fact bases exist to do so, such facts were newly
discovered only after the complaint was filed . . . ." A motion for reconsideration, not
recognized by the Federal Rules of Civil Procedure, **Clough v. Rush**, 959 F.2d 182, 186
n.4 (10th Cir. 1992), may be construed in one of two ways: if filed within 10 days of the
district court's entry of judgment, it is treated as a motion to alter or amend the judgment
under Rule 59(e); if filed more than 10 days after entry of judgment, it is treated as a
motion for relief from judgment under Rule 60(b). The standard of review for either is an
abuse of discretion. **Adams v. Reliance Standard Life Ins. Co.**, 225 F.3d 1179, 1186 n.5
(10th Cir. 2000). Nonetheless, we review the substance of this appeal de novo.

To arrest the growth of this hydra, CTI offers us *Seegmiller v. KSL, Inc.*, which, it insists, "expressly endorsed" the very distinctions between libel *per se* and slander *per se* it advances in this appeal.  626 P.2d 968 (Utah 1981).

*Seegmiller*, however, was an action to redress the alleged defamatory words *spoken* by an investigative television reporter, that is, slander, in which the Utah Supreme Court had to decide "the degree of fault which a 'private figure' must prove in a defamation action against a media defendant and whether the defendant is entitled to the benefit of a conditional privilege permitting comment on a matter of public interest." *Id.* at 969.  In that endeavor, the court quoted Utah Code Ann. § 45-2-10, the legislative directive for privileged broadcasts.[4]  *Id.* at 977 n.7.  In the same footnote, the *Seegmiller* court wondered "what the Legislature had in mind when it used the words 'libelous, slanderous or defamatory per se,'" and cited William Prosser, Law of Torts §112 (4th ed. 1971), and a Colorado case to support its reminder that "[t]he concepts of slander per se and libel per se are distinct and the term 'per se' has different meanings depending on context." *Id.*  Thus, although *Seegmiller* has since provided the decisional ground for cases involving privilege, its utility here is marginal.  *See, e.g.*, *Van Dyke v. KUTV*, 663 P.2d 52, 56 (Utah 1983) (college official investigated for sexual harassment occupied a

---

[4] Utah Code Ann. § 45-2-10 provides, in part,
   Privileged broadcasts.  A privileged broadcast which shall not be considered as libelous, slanderous, or defamatory per se is one made . . . .

position "that invited public scrutiny," shielding the reporter's comments with a qualified privilege).

Instead, this case easily aligns with the progenitor of Utah's common law of libel, *Nichols v. Daily Reporter Co.*, 83 P. 573 (Utah 1905).[5] There, Mr. Nichols, a candidate for office in the Salt Lake City Typographical Union and delegate to the national convention, sued the Daily Reporter for printing and publishing a card which stated, on one side, "Vote for Honest Jake Bosch for Delegate," and, on the other, "Explanatory Mr. C.A. Nichols owes the Daily Reporter Co. a balance of $34.25 for printing done in 1894. Draw your own conclusions and vote for Mr. Nichols, if you think he is not able to pay this debt." *Id.* at 573. The meaning of these words, Mr. Nichols alleged, was clear: unable to pay his debts, unworthy of credit, this typographer was not to be trusted; all statements of "contempt and ridicule" which damaged him "in his reputation, good repute, and credit." *Id.* Because Mr. Nichols claimed the publication was false and defamatory on its face, he did not allege special damages.

Writing on a clean slate,[6] the Utah Supreme Court stated:

It, of course, is conceded that written derogatory or disparaging words which impute to a person the commission of a crime, or degradation of character, or which have a tendency to injuriously affect him in his office or trust, profession, trade, calling or business, or which tend to degrade

---

[5] Although CTI's counsel acknowledged *Nichols* in oral argument, the case only appeared in its reply brief. *Nichols v. Daily Reporter Co.*, 83 P. 573 (Utah 1905).

[6] The court cited an 1895 Tennessee case, an 1886 Michigan case, and a 1903 federal case, among the cases and treatises relied upon, but no Utah precedent.

him in society, or expose him to public hatred, contempt, or ridicule, are libelous and actionable. It also is the well-recognized rule that when the words are libelous per se, it is not necessary to allege or prove special damages, for malice and damage are implied; but where they are not libelous per se, special damages must be averred and proven to warrant a recovery.

*Id.* at 574. Hence, the correct test to determine whether a publication is libelous *per se* is "when language is used concerning a person or his affairs which from *its nature* necessarily must, or presumably will, as its natural and proximate consequence, occasion him pecuniary loss." *Id.* (emphasis added). The presumption of damage inheres to the words of the writing itself. Without this presumption, "special damages to the plaintiff's reputation must be alleged and proved to have been the *actual and natural* result of the language used." *Id.* (emphasis added).[7]

Although cited in a later Utah case for libel,[8] *Nichols* lay dormant for sixty

---

[7] That is,

> Such words, however, may be rendered libelous by the place and circumstances of their publication, or by proof of extraneous matters, together with proof of damages other than those implied when shown to be the natural and proximate consequence of the publication.

*Nichols*, 83 P. at 575.

[8] In *Malouf v. Metro. Life Ins. Co.*, 283 P. 1065, 1066 (Utah 1929), plaintiff sued a rival insurer for libel based on a letter the rival sent plaintiff's boss, who was also the president of the Church of the Latter Day Saints, alerting him to such unscrupulous and dishonorable business practices as his rounding up L.D.S. agents to accompany his Roman Catholic managers to get "into homes that they could not go in themselves only by the introduction of L.D.S. boys." Because the "manifest purpose" of the letter was to prejudice and injure plaintiff in his employment, the court reversed and remanded for

(continued...)

years,[9] until it surfaced again in ***Western States Title Ins. Co. v. Warnock***, 415 P.2d 316 (Utah 1966), an action for libel and slander, which concluded, first, a document disparaging another's title was not libelous *per se;* and, second, statements made to opposing counsel in the course of a lawsuit were not slanderous. ***Id.*** at 318.[10] ***Baum v. Gillman***, 667 P.2d 41, 43 (Utah 1983), inexorably fused the two claims, citing ***Nichols*** for the test for "defamation,"[11] to conclude Gillman's verbal statements about Baum's sour cherry business did not "impute criminal conduct, loathsome disease, conduct incompatible with the exercise of a lawful business or unchastity," and, thus, supported no action "for either *per se* or *per quod* defamation." ***Id.*** at 43. Relying on ***Allred v. Cook***, 590 P.2d at 322 ("[t]he only damage which could come to the plaintiff would be that the defendants had fired him from his position, and the plaintiff makes no such

---

[8](...continued)
reinstatement of the case. ***Id.***

[9] The subsequent cases for "defamation" do not cite ***Nichols. See, e.g., Hales v. Commercial Bank of Spanish Fork,*** 197 P.2d 910 (Utah 1948) (slander action in which a conditional privilege was applied to bank official's words, citing Kentucky and New York cases); ***Berry v. Moench***, 331 P.2d 814 (Utah 1958) (action in libel based on doctor's letter governed by conditional privilege analysis though C.J.S. and Am. Jur. cited for definition of libel).

[10] Later, ***Nichols*** was cited in ***Allred v. Cook***, 590 P.2d 318, 321 (Utah 1979) (slander action, citing ***Nichols***, 83 P. at 573, stating, in ***Nichols***, "the evidence did not demonstrate that the plaintiff had been injured in his profession so that slander per se would lie" to provide the analysis for the alleged defamatory words spoken about the school superintendent).

[11] But, propping that test on 50 Am. Jur. 2d Libel and Slander § 9.

contention in his complaint"), the **Baum** court emphasized the statements must damage plaintiff "in a current business endeavor or pursuit. Statements which may only be injurious to some future happening do not give rise to a cause of action for either *per se* or *per quod* defamation." 667 P.2d at 43. Special damages, then, must be specific, actual, and non-speculative.

In our de novo review, "[t]o determine whether the complaint states a claim upon which relief can be granted, we must examine the complaint in light of the substantive law of [Utah] because this case arises under diversity jurisdiction." **Weatherhead v. Globe Int'l, Inc.**, 832 F.2d 1226, 1228 (10th Cir. 1987). Thus, viewing the district court's interspersion of libel and slander law from this historical perspective, we are constrained to conclude it incorrectly amalgamated the causes of action. In the end, however, the court correctly held that no statement, on its face, bore the presumption of damage, and, while perhaps two of the statements were false or "grossly distorted" if extrinsic information is referenced for libel *per quod,* **CTI** at *3, CTI failed to plead and prove special damages as required by **Nichols** and its mutations.[12]

For example, Bloomberg's statement (Statement 1) that CTI "sold 11.1 million shares of its stock at 72% discount to its market price," may be rendered libelous *per quod* with the introduction of specific, extraneous facts to establish not all of the 11.1

---

[12] We note CTI did not challenge the court's concluding, without discussion, the remaining three statements are not libelous. Consequently, we do not address them here.

million shares were, in fact, sold on February 29, 2000, the final day of the private placement when the market price was $9.875, the basis for the 72% discount rate statement.[13] Similarly, Statement 3 reporting CTI's "struggle" to sell the imaging systems may also be false with the introduction of evidence of its effort to obtain FDA approval before launching its product on the domestic market. Even with the allegation that "[a] significant portion of this loss of market capitalization was directly and proximately caused by Bloomberg's publication of the defamatory matter," neither statement becomes libelous *per quod*. CTI then alleged the loss of market capitalization exceeded $100 million, a number that bears no resemblance to the actual capitalization figures of the complaint. Further, the alleged "negative impact" on CTI's business dealings with third parties cannot rescue CTI's generalized allegation of special damages.

In assessing whether CTI's "complaint alone is legally sufficient to state a claim for which relief may be granted," **Sutton v. Utah State Sch. for the Deaf & Blind**, 173 F.3d 1226, 1236 (10th Cir. 1999), we fully recognize the district court embedded a

---

[13] The district court stated the private placement price was determined in December 1999, when the price was "around 2.50." **CTI** at *3. CTI averred in its complaint the "price of the Company's common stock offered in the Private Placement was determined on November 11, 1999, [when] the closing bid price for the Company's common stock was $3.81 per share." The difference would figure in CTI's claim of special damage, although CTI did not specifically target that calculation either.

- 12 -

correct articulation of Utah law in its disposition, citing both the statute and *West v.*

*Thomson Newspapers*, 872 P.2d 999 (Utah 1994). Section 45-2-2(1) defines libel:

> "Libel" means a malicious defamation, expressed either by printing or by
> signs or pictures or the like, tending to blacken the memory of one who is
> dead, or to impeach the honesty, integrity, virtue or reputation, or publish
> the natural defects of one who is alive, and thereby to expose him to public
> hatred, contempt or ridicule.

Utah Code Ann. § 45-2-2(1). Under *West* an action for libel by the mayor of a small

Utah town against a newspaper which published three columns alleged to be defamatory,

the court noted "[t]he term 'defamation' encompasses both libel and slander. 872 P.2d at

1007 n.12. The primary distinction between libel and slander is the nature of the

publication." *Id.* To state such a claim for defamation, plaintiff "must show that

defendants published the statements concerning him, that the statements were false,

defamatory, and not subject to any privilege, that the statements were published with the

requisite degree of fault, and that their publication resulted in damage." *Id.* at 1007-08.

Because our de novo review, based on the statute and Utah cases, concludes that

Bloomberg's statements did not bear the requisite malicious injury to reputation in the

absence of a precise statement of the damages sustained, we affirm the district court.

### III. Amendment of the Pleadings

CTI asserts the district court was obligated to permit amendment of the complaint

to offer "new allegations of special damages." Indeed, citing *Curley v. Perry*, 246 F.3d

1278, 1281 (10th Cir. 2001) (dismissal of pro se complaint proper only where it is

obvious plaintiff cannot prevail on the facts and futile to give him opportunity to amend),[14] CTI urges the district court abused its discretion without finding it "patently obvious" plaintiff could not prevail on the facts alleged. In support of its motion to amend, CTI attached the affidavit of its CFO, Kevin Packard, describing his involvement in the unraveling of the NASDAQ listing. While reiterating the sequence of communications between NASDAQ and CTI representatives, Mr. Packard failed to specify any newly minted evidence of special damages that had not already been included in the original complaint against Bloomberg. Instead, Mr. Packard asserted CTI incurred $350,000 in legal fees in its prolonged effort to reinstate the NASDAQ listing — a fact CTI surely knew when it filed its complaint, and an element of special damages not recognized by Utah law.[15]

CTI styles its motion for relief from and reconsideration of final judgment under Rules 59(e) and 60(b), presumably as a means of reopening the case to file a motion to amend under Rule 15(a). Nonetheless, having produced no showing of how it would

---

[14] CTI also relies on ***Triplett v. LeFlore County, Okla.,*** 712 F.2d 444 (10th Cir. 1983), another pro se prisoner case, in which the court recognized three exceptions to Rule 15(a) amendment.

[15] Attorney's fees, however, are permitted as special damages in a slander of title action if incurred "to clear title or to undo any harm created by whatever slander of title occurred." ***Bass v. Planned Mgmt. Servs., Inc.,*** 761 P.2d 566, 568 (Utah 1988). Otherwise, Utah requires a party seeking special damages to plead each type of damage specifically to afford the opposing party an opportunity to defend the claims. ***Hodges v. Gibson Prod. Co.***, 811 P.2d 151, 162 (Utah 1991).

properly amend its pleadings or how newly discovered evidence warranted relief from dismissal, CTI remains bound by the record it created.

The district court did not abuse its discretion in denying the motion to amend. We, therefore, **AFFIRM** the dismissal of the cause of action under Fed. R. Civ. P. 12(b)(6).